**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kevin O. DePRIEST and Steve Morrell,**
**Defendants–Appellants.**

**Nos. 92–3126, 92–3226 and 92–3935.**

United States Court of Appeals,
Seventh Circuit.

Argued June 8, 1993.

Decided Sept. 21, 1993.

John J. Thar, Asst. U.S. Atty., Office of U.S. Atty., Indianapolis, IN (argued), for U.S.

David E. Smith, Benton, AR (argued), for Kevin O. DePriest.

David W. Lamont, Evansville, IN (argued), for Steve Morrell.

Before CUDAHY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

Kevin DePriest and Steve Morrell were convicted of conspiring to possess with the intent to distribute and of conspiring to distribute a quantity greater than one kilogram of methamphetamine, a Schedule II Non–Narcotic Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1988). Mr. DePriest was sentenced to 151 months' imprisonment to be followed by 5 years of supervised release, and Mr. Morrell was sentenced to 262 months' imprisonment to be followed by 5 years of supervised release. Mr. DePriest appeals his conviction, while Mr. Morrell appeals both his conviction and his sentence. We vacate Mr. Morrell's sentence and remand for resentencing. In all other respects, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. *Facts*

From 1985 through 1990, a large methamphetamine conspiracy thrived in Evansville, Indiana, and later in the outskirts of Little Rock, Arkansas. Approximately sixty to eighty pounds of methamphetamine passed through the conspiracy during its five-year existence. Many of the primary conspirators pled guilty after the scheme was discovered and shut down, and they provided crucial testimony at the trial of Mr. DePriest and Mr. Morrell.

The conspiracy began in 1985, when Darryl Taylor visited California in search of a methamphetamine source. He met Robert Westling who agreed to be the supplier, and they worked out a system by which the methamphetamine would be delivered from California to Taylor's distributors. Apparently Westling was the source of all the methamphetamine that was distributed during the course of the conspiracy. In the beginning, Mr. Morrell was one of Taylor's "main outlets." Tr. at 207–08. Taylor's father-in-law, David Foster, testified that he

often delivered methamphetamine to Mr. Morrell for distribution. Additionally, both Robert Willingham and Christopher Silkey testified that they had bought quantities of the drug from Mr. Morrell.

Mr. Morrell remained a primary member of the conspiracy until late 1986 when he and Taylor had a falling out. Taylor believed that Mr. Morrell owed him $7,000 because of a previous drug transaction; Mr. Morrell contended that he had already paid the debt. Taylor then determined not to participate in any more drug deals with Mr. Morrell. After this disagreement, Taylor asked Willingham if he was ready to start selling larger quantities than he had been receiving previously from Mr. Morrell. Willingham assented to this new role and thus displaced Mr. Morrell as Taylor's main distributor.

Although Mr. Morrell no longer had a primary role in the conspiracy after his argument with Taylor, he did not disappear entirely from the scheme. Once Willingham began to deal directly with Taylor, Mr. Morrell became Willingham's customer. Willingham testified that he distributed "a couple of pounds" of methamphetamine to Mr. Morrell from the time their roles in the conspiracy switched in 1986 until 1990 when Willingham was arrested. Tr. at 269. Furthermore, Taylor testified that, on the day he was arrested, August 31, 1990, Mr. Morrell showed up at his house and stated that he had heard Taylor was receiving a shipment of methamphetamine and requested a "couple of pounds." Tr. at 206. Although Taylor testified that he merely wanted Mr. Morrell to leave and had no intention of giving him a portion of the expected shipment, Taylor agreed to the request. *Id.*

Mr. DePriest's role in the conspiracy began in 1987. In December 1986, when Taylor became concerned that Indiana law enforcement authorities might be suspicious of his illegal activities, he moved to Benton, Arkansas and purchased a house. Mr. DePriest owned his own plumbing business and Taylor hired him to help remodel the house. Taylor was often present during the remodeling and one day after work, he asked Mr. DePriest if he wanted to do some methamphetamine. Taylor testified that, after Mr.

DePriest had snorted a small quantity of the drug, Taylor asked him if he would be interested in selling it; Mr. DePriest said yes.

In October 1987, Taylor gave Mr. DePriest one pound of the drug. He allowed Mr. DePriest to sell it at his own pace and allowed him to pay off the price gradually. Taylor eventually gave Mr. DePriest two more distributions of two pounds and three pounds respectively. Additionally, Foster testified that he had made one delivery to Mr. DePriest in Arkansas. Bruce Hicks, another associate of Taylor's, also testified that Taylor had told him that Mr. DePriest was ready to sell some methamphetamine for him, but that Taylor was allowing him to sell it at his own pace.

The last overt act in the conspiracy was a fifteen-pound shipment of methamphetamine from California that was to be delivered to Mr. DePriest. When the courier arrived in Arkansas, however, Mr. DePriest was in the hospital for treatment on account of injuries suffered in a car accident. Consequently, the methamphetamine could not be delivered to him. Instead, the shipment was placed in storage and another member of the conspiracy retrieved it and took it to Evansville.

Mr. DePriest and Mr. Morrell were indicted for their roles in the conspiracy and were tried together before a jury. At trial, both men contended that they had not been participants in the conspiracy. Mr. Morrell's defense incorporated evidence that several members of the conspiracy may have held grudges against him because he had had romantic liaisons with their girlfriends or wives. Mr. DePriest acknowledged that he had taken methamphetamine with Taylor, but denied that he had ever sold the drug or had in any way been involved in the conspiracy.

On May 19, 1992, a jury found both defendants guilty of conspiracy to possess with the intent to distribute and to distribute methamphetamine in a quantity greater than one kilogram in violation of 21 U.S.C. §§ 841(a)(1) and 846. Mr. DePriest and Mr. Morrell raise numerous issues on appeal. Mr. DePriest contests his conviction. Mr. Morrell contests both his conviction and his

sentence and also appeals the denial of a motion for a new trial on the basis that he had discovered new evidence. For the reasons that follow, we affirm.

## II

## ANALYSIS

### A. *Sufficiency of the Evidence*

■ A defendant challenging the sufficiency of the evidence upon which he was convicted must shoulder a heavy burden. *United States v. Holland*, 992 F.2d 687, 689 (7th Cir.1993). We must uphold a conviction if, " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Byerley*, 999 F.2d 231, 233 (7th Cir.1993) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)); *see also Holland*, 992 F.2d at 689 (stating same). We also note that it is neither this court's function to reweigh the evidence presented at trial nor to reassess witness credibility. *Byerley*, 999 F.2d at 233. " 'Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilty beyond a reasonable doubt, may an appellate court overturn the verdict.' " *Id.* (quoting *United States v. Whaley*, 830 F.2d 1469 (7th Cir.1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988)).

### 1. Mr. Morrell's participation in the conspiracy

■ The indictment charged Mr. Morrell with participation in a single large conspiracy that operated from 1985 through August 31, 1990. Mr. Morrell contends that, while he may have been a member of several small conspiracies, he was not part of the single charged conspiracy. He claims that the government presented no direct evidence that he remained a part of the conspiracy once he and Taylor had their falling out, and thus the government did not establish that he participated in the entire charged conspiracy.

Viewing the evidence at trial in the most favorable light to the government, we conclude that sufficient testimony was presented to permit a jury to find that Mr. Morrell participated in the charged conspiracy. Taylor testified that Mr. Morrell had been one of his main distributors from 1985 through 1986, receiving shipments of methamphetamine and then selling them or further distributing them. Additionally, both Silkey and Willingham testified that they bought methamphetamine from Mr. Morrell. Thus, the trial testimony supports the finding that Mr. Morrell was a key member of the conspiracy until late 1986. Furthermore, he remained a member of the conspiracy for its entire duration because he never affirmatively withdrew from it.

■ We have stated that there are stringent requirements for asserting withdrawal from a conspiracy. *United States v. Schweihs*, 971 F.2d 1302, 1323 (7th Cir.1992); *United States v. Bafia*, 949 F.2d 1465, 1477 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992). A defendant can withdraw only by affirmatively disavowing the conspiracy's purpose. *Bafia*, 949 F.2d at 1477. The "defendant's membership in the conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action." *United States v. Bennett*, 984 F.2d 597, 609 (4th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 2428, 124 L.Ed.2d 649 (1993); *see also United States v. Pofahl*, 990 F.2d 1456 (5th Cir.1993) (stating same). Thus, a conspirator affirmatively must make his withdrawal known either by confessing to the police or by clearly communicating to his co-conspirators that he has abandoned the venture. *United States v. Pitz*, 2 F.3d 723, 729 (7th Cir.1993); *Bafia*, 949 F.2d at 1477; *United States v. Patel*, 879 F.2d 292, 294 (7th Cir.1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990); *United States v. Hogan*, 986 F.2d 1364, 1375 (11th Cir.1993). "Merely ceasing participation in the conspiracy, even for extended periods, is not enough" to evidence withdrawal. *Bafia*, 949 F.2d at 1477; *see also Pitz*, 2 F.3d at 729 (stating same); *United States v. Smith*, 995 F.2d 662, 677 (7th Cir.1993) (stating same). The burden to prove withdrawal remains firmly on the de-

fendant even when it appears that he has been expelled from the conspiracy. *Schweihs,* 971 F.2d at 1323.

In *Bafia,* the defendant argued that he was no longer a participant in a conspiracy to distribute cocaine after he wrecked his co-conspirator's Corvette and thus had a "falling out" with him. 949 F.2d at 1477. Although his relationship with his co-conspirator changed so that they were no longer "on good terms," *id.* at 1478, and there was no evidence that he had distributed cocaine after the accident, we held that none of these facts transformed Bafia's inactivity into a withdrawal from the conspiracy. *Id.* at 1477–78. Although Bafia may no longer have been an active participant in the conspiracy, he had presented no evidence that he had affirmatively renounced the goals of the criminal enterprise. He therefore remained a member of the conspiracy until its end. Similarly, in *Schweihs,* the defendant argued that, because he was expelled from the conspiracy by one of his co-conspirators and was no longer allowed to play a part in the illegal undertaking, abandonment of the conspiracy had been communicated to his co-conspirators. 971 F.2d at 1323. We rejected this argument and noted that the requirements for withdrawal mandate affirmative action by the defendant to evince a break with the conspiracy. *Id.* Action by the co-conspirators to limit a former member's participation is not sufficient; we clearly stated in *Schweihs* that, "withdrawal requires proof of an affirmative action *by the defendant*" before he can be considered to have renounced the conspiracy and his role within it. *Id.* (emphasis added).

Mr. Morrell has presented no evidence that he withdrew from the conspiracy. Indeed, testimony at trial supports the view that he remained a member of the conspiracy, albeit in a less significant role than he previously had occupied. Willingham testified that, once he became a main distributor, Mr. Morrell bought a couple of pounds of methamphetamine from him, and Taylor also testified that on August 31, 1990, Mr. Morrell appeared at his home, informing him that he knew a shipment of drugs was due and re-

questing several pounds of it. Because Mr. Morrell has set forth no evidence—other than his falling out with Taylor—that he affirmatively renounced the goals of the conspiracy either by informing the police or by communicating to his co-conspirators that he no longer wished to participate, we hold that the government presented sufficient evidence of Mr. Morrell's participation in the single charged conspiracy.

2. Mr. DePriest's participation in the conspiracy

Throughout trial and at sentencing, Mr. DePriest denied any involvement in the methamphetamine conspiracy. However, to succeed on his insufficiency of the evidence claim, he too must overcome a heavy burden. Mr. DePriest contends that the government's evidence was weak; he notes that no evidence of scales, drugs, drug paraphernalia, or large amounts of money were found in his home when he was arrested. Nor did the government present evidence of a suspiciously high standard of living. The existence of a conspiracy, however, is often demonstrated by circumstantial evidence. *Byerley,* 999 F.2d at 233. Moreover, " 'not only is the use of circumstantial evidence permissible, but circumstantial evidence may be the sole support for a conviction.' " *Id.* (quoting *United States v. Reed,* 875 F.2d 107, 111 (7th Cir. 1989)); *see also United States v. Burrell,* 963 F.2d 976, 988 (7th Cir.) (stating that circumstantial evidence may be sole support for conspiracy conviction), *cert. denied,* — U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992). A conspiracy exists if two or more persons agree to join together to commit an illegal act. *Smith,* 995 F.2d at 666. To prove membership in a conspiracy, the government need show only that the "defendant knew of the agreement and intended to join it." *Id.; see also Burrell,* 963 F.2d at 987 (stating that government must show defendant "knew of the illegal objective of the conspiracy and agreed to participate in its achievement").

In his brief, Mr. DePriest acknowledges that his conviction turned on the credibility of the government's witnesses. The jury has the opportunity to observe the demeanor of the witnesses and hear their ver-

**1208**

sions of the events at issue. This is an opportunity that we, as an appellate court limited to the record before us, do not have. We shall not substitute our own view of witness credibility for that of the jury. Therefore, "[o]nly if the testimony is 'inherently unbelievable' will this court overturn a guilty verdict based on the testimony of a co-conspirator testifying pursuant to a plea agreement.'" *Byerley*, 999 F.2d at 235 (quoting *United States v. Trujillo*, 959 F.2d 1377 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 277, 121 L.Ed.2d 204 (1992)).

The testimony presented by the government at trial was not inherently unbelievable: Taylor testified that DePriest received and sold three quantities of methamphetamine, in increasing amounts, over a period of time; both Foster and Hicks also testified that they had been told Mr. DePriest was distributing the drug for Taylor; and several witnesses testified that Mr. DePriest had been the intended recipient of the fifteen pounds of methamphetamine delivered in the conspiracy's last shipment. Moreover, Westling testified that, in 1989, Mr. DePriest sent him $7500 that he had been holding for Taylor and that was Westling's share of methamphetamine trafficking proceeds. Tr. at 79. Westling also testified that, in late 1990, after Taylor had been arrested, Mr. DePriest telephoned him to ask whether he would be interested in sending any methamphetamine for distribution; Westling declined the opportunity. Tr. at 81.

Additionally, when Mr. DePriest was arrested he was carrying slips of paper in his wallet on which the phone numbers of both Foster and Westling were jotted. Although Mr. DePriest and his wife presented the jury with an innocent explanation of his relationship with Taylor and his possession of the phone numbers, clearly the jury was not required to credit the DePriests' version of events. *See Burrell*, 963 F.2d at 988 (stating that "trier of fact must be free to choose among various reasonable constructions of the evidence"); *United States v. Nesbitt*, 852 F.2d 1502, 1510 (7th Cir.1988) (stating same),

*cert. denied*, 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989). Thus, the government presented sufficient evidence from which a jury could find Mr. DePriest guilty.

B. *Evidentiary and Trial Issues*

1. Mr. DePriest's notice of violation of release conditions

■ On the way into the courthouse on the first day of the defense's case-in-chief, a federal probation officer handed Mr. DePriest and his attorney a document entitled, "Notice—Violation of Order Setting Release Conditions." The Notice stated that a drug test taken by Mr. DePriest approximately two weeks prior to trial as part of his pretrial release conditions had tested positive for the presence of marijuana. The parties agree that Mr. DePriest's attorney orally moved to bar the government from using the Notice during its cross-examination of Mr. DePriest. This colloquy was unfortunately not recorded. The court did not rule on the motion at that time. The judge did rule from the bench on this issue during trial and his ruling is recorded in the transcript. However, the judge's ruling is out of sequence in the trial transcript, and the parties recall the timing of the ruling much differently.

Mr. DePriest contends that, before he took the stand, the judge called a bench conference and announced that if Mr. DePriest testified then his credibility would be at issue, thus making the Notice relevant on cross-examination for purposes of impeachment. Mr. DePriest claims that this ruling placed him in a dilemma: he could decide to face the drug use allegations on direct examination, or he could wait and have it brought out and perhaps emphasized by the government on cross-examination. Mr. DePriest chose to confront the allegations of drug use and thus revealed the accusation and denied its truth during his direct testimony. He alleges that the judge's ruling constitutes reversible error because it allowed the government to contravene Federal Rule of Evidence 608(b)[1] and prove by extrinsic means

---

1. Rule 608(b) states in pertinent part:
 Specific instances of the conduct of a witness, for the purpose of attacking or supporting the

witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, how-

that he had used drugs on the eve of trial and this impugned his credibility.

The government contests Mr. DePriest's characterization of the timing of the court's ruling and the effect that it had on Mr. DePriest's trial strategy. The government states that the ruling occurred *after* Mr. DePriest's direct examination and thus did not place him in any kind of dilemma. Moreover, the government notes that it did not refer to the Notice during its cross-examination of Mr. DePriest. Because Mr. DePriest chose to testify regarding the Notice prior to the court's ruling on his motion to preclude the evidence, the government believes that Mr. DePriest should not now be able to appeal the ruling.

Our study of the transcript reveals that references to Mr. DePriest's direct testimony were made throughout the bench conference. Thus, the government's submission that the court ruled on the admissibility of the Notice only after it had heard Mr. DePriest's testimony and had assessed the scope of the subject matter covered is most compatible with the record. Because Mr. DePriest chose to address the Notice in his direct testimony instead of requesting a ruling on his motion to bar the government's use of the Notice, he cannot now dispute the court's ruling. The court ruled only after Mr. DePriest had testified and denied the allegation of drug use. Mr. DePriest's decision to testify before he obtained a ruling on his motion effectively waived any objection that he had regarding use of the Notice.

In an analogous context, the Supreme Court has noted that in limine rulings are not set in stone:

> The ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling.

*Luce v. United States,* 469 U.S. 38, 41–42, 105 S.Ct. 460, 463–64, 83 L.Ed.2d 443 (1984).

ever, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired

When, as here, the defendant does not request a final ruling on his motion before he launches into testimony designed to preempt the effect of the government's use of adverse material, the court's ruling, yet to be made, could not have driven his choice of trial tactics. Because Mr. DePriest testified regarding the Notice prior to the court's final ruling on his motion and because the government did not cross-examine him on the allegations made in the document, no error was committed.

Even if the ruling had been made prior to the defendant's direct examination, we do not believe that reversible error would have been committed. In a case almost squarely on point, the Ninth Circuit held that a defendant waives his right to appeal a trial court's pretrial ruling that a prior conviction can be used by the prosecution for purposes of impeachment when the defendant himself brought out the fact of the prior conviction in his direct testimony. *United States v. Williams,* 939 F.2d 721, 723 (9th Cir.1991). The prosecution never raised the conviction during its cross-examination. The Ninth Circuit noted that although the defense's action was part of a strategy to ameliorate the anticipated effect of the prior conviction by bringing it out on direct examination, the defendant's decision deprived the court and the prosecution of the opportunity to reconsider their stated positions on the issue. *Id.* This result is consonant with the Supreme Court's acknowledgement in *Luce* of the mutable nature of motions in limine.

2. Alleged prosecutorial misconduct

a.

■ Both Mr. DePriest and Mr. Morrell also contend that their convictions should be overturned because the prosecutor made improper remarks during his closing argument that denied them a fair trial. In gauging the effects of an allegedly improper prosecutorial statement during closing argument, we have noted that a new trial is mandated only "if the government's comments were improper

into on cross-examination of the witness....

ones that prejudiced the defendants' rights to a fair trial." *United States v. Ferguson,* 935 F.2d 1518, 1530 (7th Cir.1991). We employ a bifurcated analysis to determine the effect of an allegedly improper prosecutorial remark. First, we must examine the remark in isolation to decide if it was indeed improper; if so, then we must discern, in light of the entire record, whether it deprived the defendants of a fair trial. *Byerley,* 999 F.2d at 236; *United States v. Van Wyhe,* 965 F.2d 528, 533 (7th Cir.1992). This second step includes an assessment of "whether and to what extent the improper remark was provoked by the defense counsel's argument— the so-called 'invited response' doctrine." *United States v. Swiatek,* 819 F.2d 721, 730 (7th Cir.), *cert. denied,* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987); *see also United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (discussing relationship between improper prosecutorial statements and the invited response doctrine).

■ In the course of the prosecutor's closing argument, the defendants objected to only one of the statements that they now contest as improper. The prosecutor stated:

Now if this prosecution was McCarthyism—if we allowed all these witnesses to get their stories straight, then you can bet David Foster would not have testified that he believes he took two pounds out to Roger Fisher. You can bet that people would have identified individuals. You can bet there would have been no discrepancies. But that didn't occur here. If you believe it did, find them not guilty and write your Congressman and have Mr. Casey and I and Mr. Hinkle indicted.

Tr. at 571–72. Both defendants then objected.

For purposes of our review, we shall assume that the prosecutor's statement was improper. In reviewing the record, however, it is apparent that the prosecutor's statement was "invited" by the defendants' closing arguments. Both counsel for Mr. DePriest and Mr. Morrell vehemently argued that the government's witnesses were liars and that, while they were in jail, they had concocted a story in order to implicate the defendants. Mr. Morrell's attorney stated:

There is nothing other than the word of these liars [the government's witnesses] to put this man in prison. I suggest to you that not one of those people knows what it means to tell the truth, the whole truth, and nothing but the truth so help me God. They don't know the meaning of that phrase.

Tr. at 539. Again, in concluding his argument, Mr. Morrell's attorney told the jury that

[t]his trial has reminded me of stories that I have read over the years about McCarthyism—a period in our history where a man destroyed or severely harmed a lot of good citizens by calling them communists and dragging them through trials and dragging them through public humiliation and blackened their names just by calling them a communist. That period in our history is over. There is no evidence against Steve Morrell, just as there was no evidence against those people—their being communists.... I urge each of you not to allow a group of liars and desperate drug dealers to destroy Steve and take away his freedom and liberty by calling him a drug dealer.

Tr. at 552–53. Similarly, in propounding Mr. DePriest's theory that the government witnesses had implicated him so that they could receive sentence reductions for cooperation, his attorney stated:

That just shows how these people [the government's witnesses] are moving targets. They can tell a lie that fast. They would rather tell it. They would rather climb a tree and tell a lie than stand on the ground and tell the truth. They are liars. Would you want your son or daughter go to the penitentiary and lose their liberty on the strength of those hoodlums, those thugs, and that trash. I submit to you that you wouldn't.

Tr. at 564–65.

The Supreme Court has cautioned that, "[c]early two improper arguments—two wrongs—do not make for a right result." *Young,* 470 U.S. at 11, 105 S.Ct. at 1044. However, if the prosecutor's remarks were

invited by opposing counsel, and "did no more than respond substantially in order to 'right the scale,' such comments [do] not warrant reversing a conviction." *Id.* at 12–13, 105 S.Ct. at 1044–45. We believe that the prosecutor's comments here did nothing more than "right the scale." Although we do not encourage prosecutors to respond in this manner—the more appropriate course would have been to object to the defense's inflammatory statements—we also believe that, as an invited response, the remarks at issue deprived neither Mr. DePriest nor Mr. Morrell of a fair trial.

b.

█ Mr. DePriest and Mr. Morrell also contend that, in his closing argument, the prosecutor improperly vouched for the credibility of the government witnesses. Neither defense counsel objected at trial to these allegedly improper statements. Thus, we review such allegations only for plain error. *See Young*, 470 U.S. at 14–15, 105 S.Ct. at 1045–46; *Swiatek*, 819 F.2d at 731; Fed. R.Crim.P. 52(b).

█ During the initial portion of his closing argument and after setting forth some of the primary testimony, the prosecutor stated:

That is what the Government[ ] lays out and the question comes now—can we believe the individuals,—the believability of these witnesses will be a point that I will discuss with you in my last argument after defense counsel has gone, but just remember why did they lie? Why did they make this stuff up? These are serious allegations and they know what will happen to them if they are caught lying. They know that the sentences, which some of them have already received, are serious.

Tr. at 538. We believe that appellants' counsel's decision not to object at trial was the more accurate assessment of the situation. We find it difficult to characterize this passage as an improper personal comment on credibility by the prosecutor. In any event, when viewed against the trial as a whole, the remarks were not such "as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Young*, 470 U.S. at 16, 105 S.Ct. at 1046.

Throughout trial, the government witnesses were questioned repeatedly about their plea agreements, their knowledge of the content of those agreements, their knowledge of any benefits they could receive for testifying, and the penalties they could incur if they lied under oath. Keeping this testimony in mind, we believe that the prosecutor's comment regarding the witnesses' motives to lie and their knowledge of the consequences of lying was a proper statement based on the testimony about their plea agreements. Thus, the prosecutorial remark does not amount to plain error. Mr. Morrell and Mr. DePriest allege other instances of prosecutorial misconduct, but those must be similarly resolved. After reviewing the record, we hold that they were proper comments based upon the testimony given at trial and did not prejudice the defendants' rights to a fair trial.

C. *Sentencing Issues*

1. Application of the Sentencing Guidelines to Mr. Morrell

Mr. Morrell contends that the district court erred when it fashioned his sentence pursuant to the Sentencing Guidelines. Specifically, Mr. Morrell asserts that the government did not demonstrate that his participation in the conspiracy extended beyond November 1, 1987, the effective date of the Guidelines. He stresses that, by virtue of his falling out with Taylor, he participated in no acts in furtherance of the conspiracy after 1986, and thus he contends that the Guidelines cannot be applied to him. Instead, he claims that he should be resentenced in accordance with the law in effect prior to the effective date of the Guidelines.

█ Our analysis of this issue dovetails with Mr. Morrell's insufficiency of the evidence claim. It is indisputable that a conspiracy that began before the Sentencing Guidelines went into effect but continued after they became law is solidly within the purview of the Guidelines. *United States v. Price*, 988 F.2d 712, 723 (7th Cir.1993); *Bafia*, 949 F.2d at 1477; *United States v. Edwards*, 945 F.2d 1387, 1390 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992). Moreover, a defen-

dant is responsible for the actions of his co-conspirators made in furtherance of the conspiracy. *Bafia*, 949 F.2d at 1477. Unless the defendant withdraws from the conspiracy, he will, therefore, remain liable for the acts of his co-conspirators. *Price*, 988 F.2d at 723.

*Bafia* squarely forecloses Mr. Morrell's argument here. In *Bafia*, the defendant argued that, because he had been expelled from the conspiracy prior to the effective date of the Guidelines and had committed no acts in furtherance of the conspiracy after that date, the Guidelines should not have been applied to him. Although he had ceased active participation in the conspiracy, we held that he had not withdrawn from it. 949 F.2d at 1477. The conspiracy had continued beyond the effective date of the Guidelines and the defendant's participation in it properly subjected him to sentencing under the framework of the Guidelines. The fact that he personally had not performed any acts in furtherance of the conspiracy after the date that the Guidelines took effect was irrelevant to our analysis. *Id.* at 1477–78. As we noted earlier in this opinion, Mr. Morrell has presented no evidence that he withdrew from the conspiracy prior to November 1, 1987. Indeed, there was evidence of his having participated in the activities of the conspiracy as late as August 31, 1990. Therefore, the district court properly applied the Sentencing Guidelines to his conviction.

### 2. Determination of base offense level

■ The base offense level for participation in a conspiracy to distribute methamphetamine hinges on the quantity of the drug involved in the crime. U.S.S.G. § 2D1.1(a)(3). Under the relevant conduct provision of the Guidelines, a defendant acting in concert with others may be sentenced on the basis of drug quantities that he did not handle personally. U.S.S.G. § 1B1.3. A defendant may be sentenced on the basis of all conduct

> in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant ... Where it is established that the conduct was neither within the scope of the

> defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.

U.S.S.G. § 1B1.3, Application Note 1. Reasonable foreseeability is the divining rod of the relevant conduct sentencing provision. *See Edwards*, 945 F.2d at 1391.

At sentencing, Mr. Morrell argued that he should not be held accountable for the entire amount of methamphetamine that passed through the conspiracy. Instead, he contended that his sentence should be based only on the ten to twelve pounds of methamphetamine that the presentence report noted he had received from Taylor during his distribution role in the conspiracy. He asserted that he could not have reasonably foreseen the amounts the conspiracy received and distributed subsequent to his falling out with Taylor, and thus those amounts could not be attributed to him for purposes of sentencing. Nevertheless, the district court sentenced him on the basis of the entire amount of methamphetamine attributed to the conspiracy.

■ Before us, Mr. Morrell submits that the district court erred by attributing to him all of the methamphetamine that passed through the conspiracy. He contends that, given his limited role after 1986, the record does not support a finding that he knew or was reasonably aware of the quantity distributed by the conspiracy after that year. The government contests this characterization. It submits that, because Mr. Morrell was a member of the conspiracy for its entirety, he should be held to have been reasonably aware of the quantities of methamphetamine that were being distributed. The government does not acknowledge this court's holding in *Edwards*, 945 F.2d at 1387, regarding the foreseeability of co-conspirator's actions.

■ Discerning exactly how much of the total drug quantity distributed through a conspiracy should have been reasonably foreseeable to a co-conspirator has often proved difficult. Nevertheless, because the period of imprisonment that can be imposed varies

significantly according to the drug quantity, it is a determination that must be made with great care. However, a district court's resolution of the foreseeability issue is a factual conclusion, and we shall reverse its determination only for clear error. *United States v. Wagner,* 996 F.2d 906, 914 (7th Cir.1993).

The controlling standards on this issue are now well-established. We have rejected the view that all drug quantities passed through a conspiracy necessarily can be deemed reasonably foreseeable to a co-conspirator for the purpose of sentencing. *Edwards,* 945 F.2d at 1395. Rather, the relevant conduct upon which a defendant may be sentenced is limited to " 'all drug transactions that [the defendant] was aware of or that he should have reasonably foreseen.' " *Id.* (quoting *United States v. Guerrero,* 894 F.2d 261, 266 (7th Cir.1990)). As we recently reiterated in *Wagner,* "[b]ecause the quantities of drugs are so important to sentencing in a narcotics case, the court must make an explicit finding as to the drug quantity and offense level and how it arrived at the sentence." 996 F.2d at 913. In making such a determination, the sentencing court "should state reasons why each individual defendant was aware of or reasonably foresaw the particular amount of drugs for which he will be held accountable, with reference to supporting evidence." *United States v. Goines,* 988 F.2d 750, 775 (7th Cir.1993); *see also Wagner,* 996 F.2d at 914 (stating same); *United States v. Young,* 997 F.2d 1204, 1211 (7th Cir.1993) (stating same); *Edwards,* 945 F.2d at 1399 (stating same). Furthermore, the "findings articulated by the district court must find support in the 'evidence before the court.' " *Young,* 997 F.2d at 1212 (quoting *Edwards,* 945 F.2d at 1399).

Mr. Morrell's argument was that, after his disagreement with Taylor in 1986, none of the subsequent quantities handled by the conspiracy could be attributed to him. The government argued to the contrary. It was therefore important that the district court resolve this controversy by determining the quantity of drugs that were foreseeable to Mr. Morrell throughout the conspiracy and to impose sentence accordingly. The district court explicitly recognized its responsibility in this regard and, indeed, cited our holding in *Edwards.* It recognized that it had to determine the amount of drugs that were reasonably foreseeable to Mr. Morrell. When it analyzed the factual circumstances, however, it did not address with sufficient clarity the reason why it believed that, despite Mr. Morrell's change in roles in the conspiracy in 1986, the entire quantity involved in the conspiracy could be attributed to him. Indeed, the district court's statement can be read to mean that the mere fact that Mr. Morrell was charged with being a member of the conspiracy for the entire period was a sufficient basis for finding him responsible for the entire quantity handled by the conspiracy. Such an approach is not, of course, compatible with the standards set forth in *Edwards.*

■ We are aware that, when a district court fails to make specific findings to support its determination of foreseeability, a resentencing is not required in every case. *See United States v. Mojica,* 984 F.2d 1426, 1443 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993); *cf. Young,* 997 F.2d at 1212 n. 4. We are also aware that, as *Wagner* teaches, merely changing one's role in the conspiracy does not necessarily mean that one can no longer be said to have foreseen the scope of the conspiracy. In most instances, the defendant's prior activities will have afforded him ample opportunity to make such an assessment. Indeed, there is some evidence that would permit the district court to make that assessment here.[2] Nevertheless, the defendant has the right under our established

---

2. The evidence indicates that, even after his falling out with Taylor, the defendant did not lose contact with the conspiracy and, indeed, remained a member. While no longer a major operative in its activities, he purchased several pounds of methamphetamine from his former customer, and he also apparently had sufficient information regarding the conspiracy to know that a large shipment was due on August 31, 1990. In the face of these facts, Mr. Morrell argues that the conspiracy changed so drastically after his fall from power that he could not have foreseen the amounts of drugs that would be involved. He notes, for instance, the expansion of the conspiracy into Arkansas. As we note in the text, it is for the district court, not this court, to evaluate these arguments.

precedent to present his factual argument to the contrary, as he has done, and to receive from the district court a specific factual determination supporting the imposed sentence. We do not find that requisite specificity here. Accordingly, the sentence imposed must be vacated and the case remanded for resentencing on the amount of methamphetamine properly attributable to Mr. Morrell.

### 3. "Minimal" or "minor" participant reduction

At sentencing, Mr. Morrell argued for a downward adjustment of either four points for being a minimal participant or two points for being a minor participant in the conspiracy. See U.S.S.G. § 3B1.2. The district court denied this request and found that Mr. Morrell could not be characterized as either a minor or a minimal participant because he had been a primary distributor for the conspiracy. On appeal, Mr. Morrell contends that he was one of the least culpable members of the conspiracy and thus should have received a downward adjustment. In support of this argument, Mr. Morrell notes that he distributed no more than ten to twelve pounds of methamphetamine and, when compared to the amounts that others in the conspiracy handled, his role as the least culpable member is obvious. He believes that this is especially apparent in comparison to Mr. DePriest who did receive a two-point offense level reduction as a minor participant even though the amounts of methamphetamine directly attributable to him were greater than those Mr. Morrell allegedly had handled personally.

A district court's determinations under § 3B1.2 rely heavily on the facts of each case and thus we review such decisions for clear error. *United States v. Cea,* 963 F.2d 1027, 1032 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 281, 121 L.Ed.2d 208 (1992); *United States v. Hagan,* 913 F.2d 1278, 1283 (7th Cir.1990). The Sentencing Guidelines state that the "minimal partici-

pant" reduction is intended to encompass "defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, Application Note 1. This adjustment is to be used infrequently and is appropriate only for single instances of misconduct such as off-loading a single shipment of marijuana or acting as a courier in a single small drug transaction. U.S.S.G. § 3B1.2, Application Note 2. In contrast, a minor participant is "any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, Application Note 3. The controlling standard for an offense level reduction under this section is whether the defendant was substantially less culpable than the conspiracy's other participants. *United States v. Davis,* 938 F.2d 744, 746 (7th Cir.1991); *United States v. Osborne,* 931 F.2d 1139, 1159 (7th Cir.1991); U.S.S.G. § 3B1.2, Background Note. A defendant's relative degree of culpability, therefore, is of primary consideration. However, "[a] court cannot determine a defendant's culpability by referring to some abstract metaphysical standard; it must look to the defendant's activities and the role he played in the conspiracy." *Cea,* 963 F.2d at 1032.

The district court found that Mr. Morrell was extensively involved in the beginning of the conspiracy and became one of Taylor's primary distributors. The court also noted that, according to Taylor's testimony, in 1990 Mr. Morrell appeared at Taylor's house and requested a couple of pounds of methamphetamine from an expected shipment. Although the court incorrectly stated that at that visit Mr. Morrell specifically expressed his desire to once again become a major distributor,[3] it is apparent from the testimony given at trial that Mr. Morrell continued to buy quantities of methamphetamine from Willingham and knew enough about the scope of the conspiracy to realize that Taylor was prepared to receive a large shipment of the drug on August 31, 1990.[4] The record clearly demonstrates that Mr. Morrell had been an integral

---

3. We believe, however, that the court could have drawn this inference from the testimony.

4. We also note that a defendant's role in a conspiracy is not necessarily diminished by the fact

that his active participation was of short duration. *United States v. Moore,* 991 F.2d 409, 414 (7th Cir.1993).

part of the methamphetamine distribution scheme and thus we do not believe that the district court erred when it refused to find Mr. Morrell substantially less culpable than the other members of the conspiracy.

### 4. Calculation of criminal history category

■ In calculating Mr. Morrell's criminal history category, the district court assessed him two points on a prior conviction for leaving the scene of an accident. Mr. Morrell had been sentenced to twelve months' imprisonment in the Henderson County, Kentucky, jail for that crime; however, ten months of the sentence were dismissed. Under Sentencing Guidelines § 4A1.1(b), two criminal history points are added to a defendant's total score for each prior sentence of imprisonment that consists of at least sixty days. Because Mr. Morrell was sentenced to serve two months of the Henderson County conviction, the district court counted two criminal history points against him. This calculation placed him in Criminal History Category II.

Mr. Morrell now argues that this calculation was incorrect. He states that he did not actually serve sixty days of imprisonment on the Kentucky offense, but was released after only forty-four days. Thus, he believes that, because his actual time served was less than sixty days, § 4A1.1(b) is inapplicable and his criminal history category was calculated incorrectly. Mr. Morrell did not contest the calculation of his criminal history category at sentencing and never contended that it was incorrect. The government asserts that, because Mr. Morrell failed to object to the calculation at sentencing, he has waived appeal on this issue.

We need not determine whether Mr. Morrell has waived this issue because his argument is unpersuasive. Sentencing Guidelines § 4A1.2(b)(2) notes that " 'sentence of imprisonment' refers only to the portion [of the sentence] that was not suspended." Thus, Mr. Morrell's "sentence of imprisonment" equals the unsuspended portion of his sentence—two months or sixty days. Moreover, in further defining the meaning of "sentence of imprisonment," the Guidelines state that "criminal history points are based on the sentence pronounced, not the length of time actually served." U.S.S.G. § 4A1.2, Application Note 2. It makes no difference whether Mr. Morrell actually served all sixty days of his sentence; his "sentence of imprisonment" was sixty days, thereby qualifying him for two criminal history points under § 4A1.1(b).[5]

### D. Mr. Morrell's Motion for New Trial

#### 1. Government's alleged use of perjured testimony

■ Mr. Morrell contends that the government knowingly used perjured testimony to convict him. At trial, Taylor and Foster stated that they were testifying pursuant to plea agreements, while Silkey affirmed that he had no agreement with the federal prosecutors. Each denied knowledge of any benefits contemplated in exchange for their testimony. Subsequent to Mr. Morrell's conviction, the government filed motions under Federal Rule of Criminal Procedure 35 to reduce Foster's and Taylor's sentences as a result of their substantial cooperation. Additionally, the prosecutor sent a letter on Silkey's behalf to the County Prosecutor's Office in which he detailed Silkey's cooperation at trial. Silkey was subsequently given early release by the State.

Mr. Morrell asserts that these witnesses falsely denied any knowledge of favorable treatment that they would receive from the

5. Cf. *United States v. Adams*, 988 F.2d 493, 496–97 (4th Cir.1993) (stating that where all but eight months' imprisonment suspended on defendant's sentence, the length of sentence of imprisonment for purposes of § 4A1.1 was eight months); *United States v. Pettit*, 938 F.2d 175, 178 (10th Cir. 1991) (holding that where defendant served six days of a six-month sentence, his sentence of imprisonment for purposes of § 4A1.1 was over thirty days); *United States v. Altman*, 901 F.2d 1161, 1166 (2d Cir.1990) (stating that "length of the sentence as imposed and not as actually served is used to determine whether the sentence is included in a defendant's criminal history category"); *United States v. Shinners*, 892 F.2d 742, 743–44 (8th Cir.1989) (holding that criminal history points based on defendant's thirty-month sentence and not on the five months actually served).

government in exchange for their testimony. The government denies that it made any promises to any of the witnesses regarding sentence reductions subsequent to Mr. Morrell's trial, other than those contained in the plea agreements.

The parties do not agree as to what legal test this court should use to evaluate a motion for new trial based on newly discovered evidence alleging the government's knowing use of perjured testimony. The government cites *United States v. Guadagno*, 970 F.2d 214, 220 (7th Cir.1992), while Mr. Morrell points toward *United States v. Mazzanti*, 925 F.2d 1026, 1029 (7th Cir.1991). It is unnecessary for us to choose between these slightly different tests [6] because each requires finding that a witness gave false testimony. We agree with the district court that Mr. Morrell has not demonstrated that Taylor, Foster, or Silkey testified falsely regarding their inducements to testify. Both Taylor and Foster testified to the terms of their plea agreements and denied any knowledge of contemplated reductions in their sentences in exchange for their testimony. Silkey testified that he was receiving no benefits from his testimony.[7] Mr. Morrell has not demonstrated otherwise. Thus, the district court did not err in refusing to grant a new trial on the basis of alleged perjured testimony.

### 2. Newly discovered evidence

 After Mr. Morrell's conviction, Donald Storey was released from the Indiana State Penitentiary and returned to Evansville where he provided an affidavit in which he swore that it was his belief that Mr. Morrell had not been involved in the methamphetamine conspiracy. Furthermore, he stated that he previously had been incarcerated with both Willingham and Taylor and that both men had expressed a bias against Mr. Morrell and a desire to see him harmed. According to the affidavit, this antipathy stemmed at least in part from Mr. Morrell's prior relationship with Taylor's late wife and from Willingham's belief that Mr. Morrell was a government informant. Mr. Morrell contends that this newly discovered evidence of Willingham and Taylor's bias against him entitles him to a new trial.

 We shall reverse a district court's denial of a motion for a new trial based on newly discovered evidence only if the district court has abused its discretion. *United States v. Kamel*, 965 F.2d 484, 490 (7th Cir. 1992); *United States v. Goodwin*, 770 F.2d 631, 639 (7th Cir.1985), *cert. denied*, 474 U.S. 1084, 106 S.Ct. 858, 88 L.Ed.2d 897 (1986). We approach such motions with great caution and are wary of second-guessing the determinations of both judge and jury. *Kamel*, 965 F.2d at 490; *United States v. Oliver*, 683 F.2d 224, 228 (7th Cir.1982). It is well-established that a defendant must satisfy a stringent multi-stage test to justify a new trial on the basis of newly discovered evidence. *See Kamel*, 965 F.2d at 490 (listing cases). The defendant must demonstrate that the evidence at issue:

> [A] new trial should be granted when, (a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That without it the jury *might* have reached a different conclusion. (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.
> 925 F.2d at 1029.

---

**6.** *Guadagno* states:

> A new trial should be ordered on the basis of the prosecution's use of perjured testimony, if the defendant establishes that 1) the prosecution's case included perjured testimony; 2) the prosecution knew, or should have known, of the perjury; and 3) there is any likelihood that the false testimony could have affected the judgment of the jury.

970 F.2d at 220 (quoting *United States v. Douglas*, 874 F.2d 1145, 1159–60 (7th Cir.), *cert. denied*, 493 U.S. 841, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989)). Using a rather similar test, *Mazzanti* states:

> In determining whether a new trial ought to be granted on the ground that newly discovered evidence discloses false trial testimony, this circuit has employed the test set forth in *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928) (emphasis in original):

**7.** The government stated to the district court that its letter regarding Silkey's cooperation was written on the instigation of Silkey's attorney who requested that the prosecutor set forth the details of Silkey's cooperation. On its face, the letter makes clear that Silkey was made no promises in return for his testimony and this information was provided to the county prosecutor's office to use as it saw fit.

(1) came to the defendant's knowledge only after trial; (2) could not have been discovered sooner through the exercise of due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a new trial.

*Goodwin,* 770 F.2d at 639; *see also Kamel,* 965 F.2d at 490 (stating same).

Mr. Morrell cannot satisfy these demanding requirements. Storey's affidavit presents little more than impeaching evidence; other than Storey's own opinion, it contains no evidence in support of Mr. Morrell's innocence on the substantive offense. Furthermore, both Willingham and Taylor were cross-examined extensively at trial regarding their motives for testifying against Mr. Morrell, including Taylor's feelings about the fact that Mr. Morrell and Taylor's late wife had had a child together. For these reasons, we agree with the district court that Storey's affidavit does not present evidence that would lead to acquittal in the event of a new trial. Thus, the district court did not abuse its discretion when it denied Mr. Morrell's motion.

### 3. New trial in the interest of justice

In his final argument on appeal, Mr. Morrell contends that the newly discovered impeaching evidence mandates a new trial pursuant to Federal Rule of Criminal Procedure 33 [8] and *United States v. Taglia,* 922 F.2d 413 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991). Because Mr. Morrell's conviction was based entirely on the testimony of the government's witnesses—all convicted drug dealers—impeachment of their testimony was, he asserts, vital to his defense and thus a new trial is necessary to further the interest of justice.

Mr. Morrell's argument has no merit. *Taglia* is inapposite to the present case. In *Taglia,* we posited that, when the govern-

ment's case rested on the testimony of one witness who was discovered after trial to be unworthy of credence because he had lied consistently in numerous other cases, the district court, in the interest of justice, has the power to grant a new trial and prevent the conviction of an innocent person. 922 F.2d at 415. We also noted in *Taglia* that "it will be the rare case in which impeaching evidence warrants a new trial...." *Id.* We do not believe that Mr. Morrell has presented us with such a case. Unlike the situation set forth in *Taglia,* his conviction was not premised on the demonstrably dubious testimony of a single witness. Numerous witnesses spoke of Mr. Morrell's involvement in the conspiracy and Storey's affidavit does not make this testimony inherently unbelievable. Furthermore, convictions for conspiracy are often based on the testimony of convicted felons. Their credibility is a matter for the jury to weigh. *See United States v. Gunning,* 984 F.2d 1476, 1480–81 (7th Cir.1993); *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989). Thus, allowing a conviction to stand on the basis of such testimony does not derogate the judicial process.[9] *See Gunning,* 984 F.2d at 1481.

### Conclusion

For the foregoing reasons, we vacate Mr. Morrell's sentence and remand for resentencing. In all other respects, we affirm the judgment of the district court.

AFFIRMED IN PART AND REMANDED IN PART.

---

8. Rule 33 states in part that a court may grant a defendant a new trial if so required in the interest of justice.

9. We also note that the court instructed the jury to view with caution and care the testimony of those witnesses appearing pursuant to plea bargains. It gave the same instruction regarding the testimony of those witnesses who were using drugs when the events they described took place.