21 F.3d 431
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
John L. TAYLOR, Jr., Milton Sims, Jr., Nathan Holloway,
Frank Arms, Roosevelt Williams, Gerald Crawford,
Corey D. Sims, and Saul Ochoa,
Defendants-Appellants.
 Nos. 90-3633, 90-3635, 91-2016, 91-2067, 91-2430, 91-3327,
92-1166 and 92-1647.
 United States Court of Appeals, Seventh Circuit.
 Argued April 9, 1993.*
Decided March 31, 1994.
As Modified on Grant of Classification
April 14, 1994.
 
 Before POSNER, Chief Judge, and BAUER and ILANA D. ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Defendants John L. Taylor, Jr., Milton Sims, Jr., Nathan Holloway, Frank Arms, Roosevelt Williams, Gerald Crawford, Corey D. Sims, and Saul Ochoa were convicted of conspiring to distribute cocaine and related offenses. Each appeals one or more of his convictions and several of the defendants challenge their sentences as well.
 
 I. FACTS[1]
 Beginnings of the Conspiracy
 
 2
 The conspiracy began in the Los Angeles suburb of Gardena, California in approximately 1985 or 1986 and eventually involved the distribution of kilogram quantities of cocaine from Los Angeles to Milwaukee. Tony Love and brothers Milton and Corey Sims began distributing small quantities of cocaine supplied by Saul Ochoa, also known as Jesse. During the early part of 1986, Love was receiving the cocaine and cooking it and both Milton and Corey Sims were distributing it for Love.
 
 
 3
 Sometime in the fall of 1986, a Milwaukee native, Terrence Roberson, brought Milton Sims to Timothy Eastern's residence in Milwaukee. At the time, Roberson was living in the Los Angeles area and making frequent trips to Milwaukee carrying kilogram quantities of cocaine for further distribution. Eastern, a high school friend of Roberson's, saw Roberson receive a bag of cash from another individual at Roberson's mother's house in Milwaukee. Roberson stated that the cash represented the proceeds of a one-half kilogram sale of cocaine he was running from Los Angeles to Milwaukee for a man named Fred Hood. Roberson was paid $500 and one ounce of cocaine for every kilogram of cocaine he brought to Milwaukee. Shortly thereafter, Eastern entered the cocaine business with Roberson. Initially, Eastern was supplied by Stella Roberson, Terry's mother. He received for further distribution one-eighth ounce quantities from Stella on several occasions.
 
 
 4
 In late 1986 through 1987, Milton Sims also began bringing cocaine to Milwaukee through airports. Sims started supplying Eastern with small quantities of cocaine. Eastern then switched his source of supply from Stella Roberson to Milton Sims when Sims offered Eastern a better price. The cocaine Sims provided Eastern was further distributed in the Milwaukee area through Nate Holloway and Burt Black. Holloway distributed for Eastern for approximately one month until Eastern stopped supplying him because Holloway's money was often short. Holloway during this time also received some cocaine from Terrence Roberson.
 
 
 5
 For a brief time, Eastern switched suppliers from Milton Sims to a Los Angeles drug dealer named Barry Walker, who was also supplied by Saul Ochoa. Eastern received cocaine from Walker through Federal Express, some of which was sent to Nate Holloway's residence on behalf of Eastern. After several months, Eastern terminated his relationship with Walker and eventually resumed his relationship with Milton Sims, who was still carrying cocaine from Los Angeles to Milwaukee on a regular basis.
 
 
 6
 At one point, Eastern began traveling to the Los Angeles area to socialize with Roberson and Milton Sims, both of whom, along with Barry Walker, lived in the same apartment complex in Gardena, California. In the spring of 1987, while staying with Terry Roberson, Eastern witnessed a transaction between Roberson and three Hispanic men. At the end of his trip, the three Hispanic men, one of whom was Saul Ochoa, carried a cardboard box containing between four and six kilograms of cocaine to Roberson's apartment. These individuals unpacked the cocaine while Roberson dumped a stack of cash on the table. Saul Ochoa counted the cash and found that it was a few thousand dollars short. Eastern learned from Roberson that the cocaine he was taking to Milwaukee for Fred Hood was supplied by Ochoa.
 
 
 7
 Milton Sims, also known as Bud, soon developed a market in the Milwaukee area for his cocaine and cultivated a group of customers. In the beginning Sims had four customers: Jeff Pickett, Frank Arms, James McGee and Gerald Crawford, also known as "Wee Wee." As business expanded, Sims started using other individuals to help him distribute cocaine. Rodney Ross, another Gardena, California friend of Milton's, came to Milwaukee to assist Sims. Ross distributed in the Milwaukee area for Sims to individuals such as McGee, Pickett, Arms and Crawford. Eventually Ross was replaced in Sims' organization by a man named Darryl Ellison, also known as "Tooter".
 
 
 8
 On one occasion, Eastern and Sims went to a female customer of Sims, Pam, with a couple ounces of cocaine. At Pam's, "Wee Wee" came to the house to pick up the cocaine. On another occasion, "Wee Wee" came to Nate Holloway's house with a cassette case full of cash. Eastern learned that the cash was the proceeds from a half kilogram of cocaine which Sims had provided to Crawford. Eastern understood "Wee Wee" to be one of Sims' smaller customers who had worked his way up from buying ounce quantities to half kilogram quantities.
 
 
 9
 Sometime in the summer of 1987, Roberson, Sims and Eastern met a Milwaukee drug dealer named Errol Jackson at a Milwaukee area nightclub. Roberson had a conversation with Jackson about cocaine prices and told Jackson, then a customer of Fred Hood, that he was paying Hood too much money. Shortly after this, Roberson was arrested at Los Angeles International Airport while transporting six kilograms of cocaine bound for Milwaukee. Following the arrest of Roberson, Sims and Eastern again talked to Jackson sometime in the summer of 1988. Jackson told them he was looking for a source of cocaine. Sims hesitated to deal with Jackson because he was too flashy. However, Sims told Eastern that he could do business with Jackson if he wished. Two separate one kilogram deals took place between Eastern and Jackson. Sims supplied the cocaine for both deals. The second transaction involved Nate Holloway, who delivered the kilo to Jackson for Eastern. After the second transaction, Eastern stopped delivering to Jackson and was replaced as a middleman by Holloway. Sims and Holloway continued to do business with Jackson. In early 1989, Jackson called Holloway from jail. Holloway contacted Sims about the phone call and Sims became suspicious. Sims feared that Jackson was cooperating with the authorities and was attempting to set them up.
 
 
 10
 Over the course of the conspiracy, Eastern also did two or three kilogram sized deals with another customer of Sims, Frank Arms. Eastern first met Arms at Stella Roberson's house. There, Eastern witnessed Milton Sims "front" Arms a couple of ounces of cocaine and was told by Sims that Arms could be trusted. On the first deal, Eastern, under Sims' direction, obtained a kilogram of cocaine, met Frank Arms and exchanged the cocaine for a bag full of money. A second deal involved Eastern picking up money from Arms which was owed to Sims for cocaine. Another time, "Tooter" and Eastern retrieved a sack of cash totalling between $40,000 and $45,000, and on yet another occasion they took a kilo of cocaine to Arms' sister's house.
 
 The Federal Express System
 
 11
 Sometime early in 1988, McGee, one of Sims' customers, recruited three women, Linda Williams, Rita Brown, and his girlfriend, Carolyn Baker, to assist Milton Sims in the Milwaukee side of his cocaine distribution business. All three women received kilogram and multi-kilogram packages of cocaine via Federal Express from Milton Sims and his associates in Los Angeles. All three women would also send large sums of cash (up to $80,000) given by McGee, Sims, "Tooter", Roosevelt Williams, and Eastern, to addresses in California provided by McGee. In exchange for their services, the women would be paid and sometimes given cocaine for their personal use.
 
 
 12
 Linda Williams received between three and five Federal Express packages each containing one or two kilograms of cocaine. All of the packages were sent in the name of a fictitious person. Williams would know the name in advance from her Los Angeles connections. Williams would call a beeper number and enter her phone number to be displayed on the beeper. She would then receive a call from a female or Milton Sims informing her of the name on the package and the date the package was to arrive. After receiving the package, she would burn the receipts and hide the package until either Frank Arms or "Wee Wee" came to pick it up. Crawford and Arms came to her house approximately three or four times to get the cocaine. Crawford was always required to pay Williams up front for the cocaine, but on one occasion, Arms was "fronted" a shipment.
 
 
 13
 During the course of the Federal Express system, in April of 1988, Gardena, California police officers were investigating cocaine related activities of Corey Sims. On April 26, 1988, the officers utilized a confidential informant named Kenny to make a controlled purchase of a half ounce of cocaine from Corey Sims. Subsequently, the agents obtained and executed a search warrant for Milton and Corey Sims' residence. Found in the search was a half-kilogram of cocaine in Corey Sims' bedroom, two rifles, and, in another room of the house, a purse with $9,200 in cash. Agents also found a Federal Express package sent from Milwaukee by "J. McGee" to "Future Sims" containing $21,900 in cash. At this time, Milton Sims told the police officers that the money and the cocaine were owned by Corey Sims and that Corey Sims was a drug dealer.
 
 
 14
 On July 7, 1988, DEA agents in Memphis, Tennessee intercepted two Federal Express packages of cocaine, containing three kilograms each, en route from Los Angeles to Milwaukee. The day before, DEA agents had received a call from a Federal Express supervisor who had informed them of the packages. The DEA in Milwaukee then attempted to make a controlled delivery of the packages to the Milwaukee addresses. However, the logistics of this attempted controlled delivery caused the packages to be late. This alerted Sims and his associates that law enforcement officials might have intercepted the packages. Both Sims and McGee advised Williams and Brown not to accept the packages. Williams refused to accept one package when an undercover DEA agent, posing as a Federal Express employee, attempted to deliver it. The package was addressed to "Sheryl Brown," and Williams simply informed the agent that no person by the name of Sheryl Brown resided at that location. The other package, destined for Rita Brown, could not be delivered because she mistakenly provided the Los Angeles people with a non-existent address.
 
 
 15
 Following this incident, on July 31, 1988, police stopped Corey Sims at Memphis International Airport and seized $15,665. Corey had travelled to Memphis to pick up the proceeds of a kilogram of cocaine sent to Memphis by Ann Love on behalf of Milton Sims. Corey Sims, however, told police that the cash was the proceeds from the sale of some of his father's land and a car. During this period, Corey Sims also made a trip to Milwaukee to distribute cocaine. "Tooter" likewise travelled to Milwaukee carrying a kilogram of cocaine for Corey. Eastern received half of that kologram and paid Corey $4,000 in Milwaukee. Eastern eventually wired the remaining $3,000 he owed Corey for the deal through Western Union. Meanwhile, Corey Sims continued selling cocaine in the Los Angeles area.
 
 
 16
 Tony Love, Milton Sims' Gardena, California associate, came to Milwaukee sometime in mid summer of 1988, and stayed at Eastern's mother's house. Love came to Milwaukee to oversee one kilogram of cocaine which was sent from Saul Ochoa in Los Angeles through Federal Express to a Milwaukee apartment belonging to Eastern's girlfriend. Eastern received one-half of the kilo and Rodney Ross received the other half. During Tony Love's stay in Milwaukee, he, Rodney Ross, Milton Sims and Nathan Holloway went to a Milwaukee night club and met Lisa Spivy, who became romantically involved with Rodney Ross. Spivy sent boxes of cash to Los Angeles on behalf of Ross. In mid September of 1988, Tony Love passed away in Los Angeles and both Milton and Corey Sims attended his funeral.
 
 The Courier System
 
 17
 Sometime following the loss of six kilograms of cocaine through Federal Express, the Sims organization switched to a system of couriers. The first courier was Tony Love's mother, Ann Love. Ann Love was sixty two years old, with five children and sixteen grandchildren, when she started her association with the Sims organization. In the summer of 1988, she mailed a package for Milton Sims containing cocaine to Memphis, Tennessee. In addition, Sims had her mail a second package of cocaine, this one to Milwaukee. Ann Love received $50 for each package. She also picked up a Federal Express package containing money sent from Milwaukee and delivered it to Landry Hampton's communications shop for Milton Sims.
 
 
 18
 At the end of August, 1988, Milton Sims asked Ann Love to accompany "Tooter" with a suitcase containing cocaine on a trip to Milwaukee by Greyhound bus. When they arrived in Milwaukee, she and "Tooter" were met at the bus depot by Nate Holloway and driven to Holloway's residence. Holloway then took Ann Love to a Milwaukee hotel and paid for her room. The next day, Holloway came to the hotel and gave Love and "Tooter" additional cash to fly back to California.
 
 
 19
 Following her son Tony Love's death, Milton Sims again asked Ann Love to come to Milwaukee. After flying to Milwaukee, she met Milton at a hotel and received a bag of cash totalling $100,000. Milton instructed her to give the cash to "Jesse," whom Love knew to be Tony's neighborhood acquaintance, Saul Ochoa. She flew back to Los Angeles with the cash and gave Saul Ochoa the money at her daughter Beverly Ann White's house. Saul counted the money and stated that it was between $30,000 and $50,000 short. Saul then called Milton Sims, who was in Milwaukee, and began swearing at him regarding the shortage, criticizing Sims for having too many people handling his money.
 
 
 20
 Around November of 1988, Milton Sims again asked Ann Love to transport cocaine to Milwaukee. Sims delivered ten kilograms of cocaine to Love with the expectation that she would bring the cocaine by bus with "Tooter" to Milwaukee. Love was to receive $10,000 for her efforts. "Tooter", however, never showed up at the bus depot, so instead of traveling to Milwaukee with the cocaine, Ann Love put the cocaine unaccompanied on the bus. She then flew back to her home in Texas and called Milton Sims advising him of what had transpired. She then called the Milwaukee Police Department and told them about the cocaine. A police officer instructed Love to send the claim check back to its owner, which she did, sending it to Sims via Federal Express to Landry Hampton's communications business. After finding out, Milton Sims called Ann and threatened to have her killed. A Milwaukee police detective, Ernie Meress, who took the call from Love, retrieved the suitcase when it arrived in Milwaukee. He opened the suitcase and found it to be empty. Approximately two days later, an unidentified individual attempted to take possession of that suitcase.
 
 
 21
 On November 8, 1988, Milton Sims met Beverly Ann White. He came to her residence with Corey Sims, Adrienne Ross, and "Tooter". Milton told her that he had given her mother ten kilograms of cocaine which she was supposed to take to Chicago, but did not. Sims stated that he obtained the cocaine from Saul Ochoa and that he was required to pay Ochoa for this loss. Sims wanted Beverly to talk to Ann Love to get back the cocaine or his money. Sims told Beverly that if Ann did not come up with the cocaine or his money, the people from whom he had received the cocaine might hurt Beverly or her children. Sims also informed Beverly that the ten-kilogram transaction had occurred at Beverly's house. Two days after this conversation, Sims called Beverly and she told him she was going to call the police.
 
 
 22
 After the ten-kilogram loss, Adrienne Ross, Milton Sims' Los Angeles girlfriend, started taking a larger role in Sims' organization. She began handling the money side of the business and also began handling the couriers. The first courier after Ann Love was Roosevelt Williams, a retired Greyhound bus driver. Another individual, Thomas Green, known to everyone as "Dog," also began running cocaine for Sims. Adrienne handled the purchase of train and bus tickets for the couriers and eventually began handling the cocaine, packing it into suitcases with spices and other items to mask its scent.
 
 
 23
 Adrienne Ross also had numerous contacts with Saul Ochoa and his workers over the course of her participation in Sims' organization. Ochoa employed "workers" to directly handle the cocaine and cash. Adrienne dealt with four of these workers. Most of her contact with Ochoa involved cash used to repay Ochoa for cocaine. About half of the time, she observed Ochoa personally overseeing the activity. When the activity involved cocaine, she would ordinarily switch cars with one of Ochoa's workers, which would contain cash, and would take the car containing cocaine. During these deals, Ochoa would oversee the transaction in a second car.
 
 
 24
 Adrienne did one face to face cocaine transaction with Ochoa set up by Milton Sims sometime after December of 1988. Sims instructed her to exchange cars with Ochoa. She drove to a restaurant in a rented car containing the cash. She then met Ochoa and his workers and gave her car keys to one of the workers. Ochoa pointed out his car and gave her the keys. She then drove the car (which she knew contained cocaine) to Rodney Ross' house.
 
 
 25
 John Taylor, Milton's uncle, also became a courier. On March 15, 1989, at Mitchell International Airport in Milwaukee, airport security agents stopped Taylor and questioned him about the contents of his bag. The x-ray machine had disclosed a suspicious shape. Agents opened the bag and found two shoe boxes wrapped in tape containing envelopes with $69,950 in cash. Taylor told the agents that he was running an errand for an individual named "Bob," whom he had known a couple of years but did not know his last name, and that he was unaware of what was inside the taped shoe boxes. Security confiscated the money and gave Taylor a receipt. Sims hired an attorney to try to get the money back. Sims and Taylor then concocted a story about the money stating that it was the proceeds from a sale of property.
 
 
 26
 Following this, in August of 1989, Los Angeles law enforcement officials began working with Kenny, the confidential informant, to infiltrate Sims' organization. The target of the investigation was John Taylor. Kenny introduced an undercover officer to Taylor. On August 8, the officer and Taylor met at a restaurant and began negotiations for the purchase of cocaine. The officer offered Taylor $6,000 in cash for a quarter kilogram of cocaine. Taylor indicated he was willing to do the deal. However, negotiations broke off when Taylor demanded the money up front. Eventually, on the following day, the two agreed to use Kenny as a go-between. Kenny would exchange the cocaine for the cash and then give the cocaine to the officer. During the deal, Taylor noticed he was being tailed while driving with Kenny to pick up the cocaine and Taylor canceled the deal. After the breakdown with Taylor, Kenny introduced the officer to an individual known as "Duck" and the two began negotiations. As the deal was consummated outside "Duck's" residence, John Taylor arrived in his car, looked at the two and disappeared up "Duck's" driveway.
 
 
 27
 Rita Brown and Carolyn Baker also became couriers for Sims, running cash to Los Angeles and cocaine back to Milwaukee. Brown began travelling to Los Angeles for Sims in approximately September of 1989. She made approximately seven trips to Los Angeles for Sims. On one occasion, Brown went to Sims' apartment in Los Angeles and received a duffle bag full of cocaine from Adrienne Ross, who then took her to the bus station. Eventually, Brown started using a double girdle (two girdles sewn together) in which she could conceal large sums of cash. She received $500 for transporting cash to Los Angeles. If she returned to Milwaukee with cocaine she was paid an additional $1,500. Milton Sims or "Tooter" paid her for her services. On her last trip to Los Angeles, in February of 1990, Corey Sims and "Tooter" greeted Rita and took her to Milton Sims' apartment, where "Tooter" and Corey counted the cash she had brought from Milwaukee.
 
 
 28
 Meanwhile in Milwaukee, on November 26, 1988, a Milwaukee police officer gave chase to a Ford Bronco driven by Gerald "Wee Wee" Crawford after Crawford had run a red light. Crawford eventually stopped the car, exited quickly and began to talk to the officer. As this transpired, a female passenger exited the Bronco and began walking away. The officer ordered her back. As she started to comply, Crawford began talking to the officer even more rapidly. While the officer attempted to handcuff Crawford, the female fled. The officer chased her and Crawford himself fled as well. The officer eventually caught up with the female and in the ensuing struggle, Crawford yelled to the female and she then threw a white softball-shaped object to Crawford. The officer arrested her and found a white powdery substance covering her and the area of her arrest. A back-up officer came to the scene and gave chase to Crawford. Prior to apprehending Crawford, he observed Crawford (who was standing on a porch) throw an object into the air which then began to disintegrated into the night-time rain. After throwing the object, Crawford wiped his hands on his jacket. The officers hurriedly scraped together the white powdery substance before the rain could wash it away. Analysis done on the powder identified the substance to be cocaine.
 
 
 29
 On February 20, 1990, two Milwaukee police officers stopped a vehicle in Milwaukee which was heading the wrong way on a one-way street. Inside the vehicle were Gerald Crawford and two other individuals. After stopping the vehicle, the driver quickly exited and began talking to the officers. One of the officers approached the car and observed a man in the back seat scooping up handfuls of cash which were spread across the entire floor of the car, with most of it settled in the rear floor area. It appeared to the officer that the man in the front seat of the car, Crawford, had thrown the cash from the front seat area into in the back. The officer then ordered Crawford out of the car and conducted a protective search of his person. Crawford was carrying a cocked and loaded .32 caliber semi-automatic pistol. The cash totalled approximately $2,775.
 
 
 30
 Carolyn Baker also began traveling to Los Angeles in approximately September or October of 1989. She made six or seven trips to Los Angeles carrying cash. She also wore the double girdle. On three or four occasions she returned to Milwaukee with cocaine. Milton Sims, Adrienne Ross or "Tooter" provided the cocaine for her. Normally, the cocaine would be transported in a carry-on bag on an Amtrak train to Chicago. In Chicago someone would pick up Baker and drive her to Milwaukee. On arrival in Milwaukee with the cocaine, she would call Sims. One time, Sims contacted her and asked her to bring the cocaine to a bar. Sims, "Tooter," and Rodney Ross met her there. Outside the bar she gave Ross one kilogram of cocaine.
 
 
 31
 On March 7, 1990, Baker was arrested at the Amtrak station in Los Angeles before boarding a train bound for Milwaukee with four kilograms of cocaine. Agents questioned Baker and after implicating various persons, she agreed to cooperate with the authorities. Rich Andrews, a DEA agent based out of Milwaukee, took custody of Carolyn Baker for the purpose of making a controlled delivery of the cocaine. Andrews and other agents returned with Baker to her Milwaukee residence and under the agents' directions, she placed a call to Milton Sims' beeper. Eventually Sims and "Tooter" arrived at Baker's house. After they entered, Baker alerted both Sims and "Tooter" that she had been arrested and that police were in the house. Both Sims and "Tooter" fled. "Tooter" escaped, but Sims was apprehended. Sims told the agents that his name was "Byron Edmond," and a subsequent search yielded a California driver's license bearing a photograph of Sims and the name "Byron Edmond."
 
 
 32
 Meanwhile, in Los Angeles, officers were investigating the link between Baker and the Sims organization. Law enforcement officials determined that she had been staying at the Courtesy Inn Hotel in Los Angeles in room 225. They proceeded to the hotel and noticed that the room was still occupied. The next day, March 8, 1990, an agent stood outside room 225 and heard male voices. He observed four males exit the room, go into a parking lot and enter two separate cars. One of these individuals, later identified as Corey Sims, entered a blue Chevrolet which was later determined to be registered to Milton Sims. Further detective work revealed that the car had later been sold to "Tooter."
 
 
 33
 On February 22, 1991, Gardena police officers observed five Hispanic males standing around a street corner in Gardena. One officer recognized Saul Ochoa. The officers observed Ochoa and the others enter a car with another driver. The officers stopped the car and questioned Ochoa and the others. Ochoa told the police he was "Martin Garcia" and produced a false ID card bearing his photo and the name Martin Garcia." Ochoa was then taken into custody an arrest warrant from the Eastern District of Wisconsin. Ochoa was searched and a wad of $1,000 cash was found in his front pocket and a mobile phone was found in the car.
 
 The Handgun
 
 34
 In 1986, Roosevelt Williams purchased a .380 caliber semi-automatic pistol from Bright and Johnson's Sporting Goods Store in Elmwood Park, Illinois. Prior to the arrest of Milton Sims, Sims, Roosevelt Williams and Tim Eastern met socially. Sims asked Williams to bring his handgun. Williams placed the handgun into the trunk of Eastern's car, where it remained for approximately four months. The night before Sims was arrested, Sims and "Tooter" visited Eastern and at that time, Eastern returned the gun to Sims. Sims them gave it to Rita Brown in a paper bag for safekeeping. DEA authorities obtained the gun when Brown was arrested. When authorities retrieved the gun, they discovered that although it was somewhat rusted, it was loaded with a round in the chamber and ready to fire. Both Williams and Milton Sims were convicted of using this firearm in relation to a drug trafficking offense. See 18 U.S.C. Sec. 924(c).
 
 II. ANALYSIS
 A. John Taylor
 
 35
 1. Sufficiency of Evidence--Conspiracy (Count One)
 
 
 36
 Taylor argues that there was not enough evidence to demonstrate his participatory link with the conspiracy and that, at most, the evidence proved only an illegal agreement between him and Milton Sims to transport $69,500 of cocaine proceeds from Milwaukee to Los Angeles. We disagree.
 
 
 37
 Although we require the government to establish each defendant's participation in a conspiracy with "substantial evidence" ( United States v. Durrive, 902 F.2d 1221, 1228 (7th Cir.1990), a defendant nonetheless bears a heavy burden in challenging the sufficiency of this evidence on appeal. United States v. Goines, 988 F.2d 750, 758 (7th Cir.) (citing United States v. Gutierrez, 978 F.2d 1463, 1468 (7th Cir.1992)), cert. denied, 114 S.Ct. 241, 483, 558 (1993). As with any other sufficiency of the evidence argument, we review the record in a light most favorable to the government, granting it the benefit of all reasonable inferences that may be drawn from the evidence. Id.[2] And we do so keeping in mind that circumstantial as well as direct evidence will support a conspiracy conviction. Id.; United States v. Townsend, 924 F.2d 1385, 1390 (7th Cir.1991) ("Conspiracies, like other crimes, may be proved entirely by circumstantial evidence.") (citing Durrive, 902 F.2d at 1225). Our focus ultimately is on whether the evidence would permit a reasonable jury to conclude that the defendant knew of the conspiratorial agreement and intended to join it. Goines, 988 F.2d at 758-59.
 
 
 38
 We note at the outset that the evidence was more than sufficient to establish that by the time Taylor allegedly involved himself in the conspiracy, Sims had couriers regularly travelling the circuit between Los Angeles and Milwaukee to deliver cocaine to the distribution network in Milwaukee and return to Los Angeles with the proceeds. Against this backdrop, the government posits that Taylor succeeded Ann Love and Roosevelt Williams as one of Sims' couriers. As proof that Taylor assumed this role, the government relies on the following evidence:
 
 
 39
 (1) Amtrak records place Taylor (a Los Angeles resident) in Milwaukee on February 14, February 25, and March 10, 1989. Tr. 326-27; Gov.Ex. 258-60.
 
 
 40
 (2) Taylor was stopped by Sheriff's deputies at Mitchell Airport in Milwaukee on March 15, 1989 and $69,500 was seized from his luggage. Tr. 294-300. Taylor told the deputies that he didn't know the cash was there, that it did not belong to him, and explained that he was running an errand for a man he knew only as "Bob". Tr. 317-322. Sims subsequently hired Taylor a lawyer to try to get the money back. Eastern Tr. 94-95.
 
 
 41
 (3) Business card notations in Taylor's wallet contained addresses or phone numbers associated with co-conspirators Roosevelt Williams, Darryl "Tooter" Ellison, Milton Sims, and Timothy Eastern. Tr. 325-26; Gov.Ex. 256, 257, 507.
 
 
 42
 (4) In August 1989, undercover agents in Los Angeles attempted to negotiate a purchase of one-quarter kilogram of cocaine from Taylor. After two attempts, the negotiations broke down and the agents made the purchase from another individual, Donald Taylor, known to them as "Duck." The transaction took place at "Duck's" residence, and after it was completed, the agents observed Taylor arrive, park his car in front of the residence, and walk down the driveway into the house. Tr. 368-80.
 
 
 43
 (5) Taylor's residence was searched on March 26, 1990. Found on the premises were mobile phone documentation, notations bearing beeper numbers for Milton Sims and co-conspirator James McGee, a phone number for co-conspirator Tim Eastern, numbers for Landry Hampton and "Duck," and a driver's license in Taylor's name bearing a false birth date and an address that corresponded with the residence of Milton Sims' mother. Tr. 185-192; Gov.Ex. 264-70.
 
 
 44
 (6) Phone toll analysis of calls corresponding chronologically to Taylor's train and plane trips to Milwaukee established contacts between him, Milton Sims, Roosevelt Williams, Tooter Ellison, and Tim Eastern. Tr. 548-558, Ex. 500-504.
 
 
 45
 We agree that this evidence was sufficient to establish Taylor's agreement to participate in the conspiracy by (at a minimum) transporting proceeds from the sale of cocaine from Milwaukee to Los Angeles. Taylor's trips to Milwaukee are certainly consistent with the courier system Sims had established. The large amount of cash found in his luggage at the conclusion of his last known trip is particularly probative, to the extent one may reasonably infer that the money constituted proceeds from cocaine sales. And we think this inference is reasonable--few people would pack nearly $70,000 in cash in their luggage for legitimate purposes. Taylor suggested at trial that he was carrying the money with him for purposes of purchasing property for his children, but the jury was certainly entitled to reject that implausible story. Moreover, the fact that Sims hired a lawyer for Taylor in an effort to retrieve the money confiscated tends to confirm (absent an extraordinarily philanthropic impulse on Sims' part) that the cash was drug proceeds rather than a real estate down payment. Indeed, according to Timothy Eastern, Sims later remarked that he had sent Taylor to Milwaukee to pick up a large sum of money and that Sims intended to try to retrieve the cash from the authorities. Eastern Tr. 93-95.
 
 
 46
 Finally, even if Taylor's involvement was limited to three or so trips to Milwaukee, we believe it reasonable for the jury to infer that he had joined the larger conspiracy. As we have previously observed:
 
 
 47
 Not every coconspirator must participate in, or even know the details of, every aspect of the conspiracy. It is enough for the government to prove that each knew of the agreement to distribute cocaine and joined that agreement.
 
 
 48
 Goines, 988 F.2d at 772. See also United States v. Auerbach, 913 F.2d 407, 415 (7th Cir.1990). Based upon his repeated service as a courier, a jury could reasonably infer that Taylor was at least aware of the illicit purpose of the conspiracy and of its broad outlines, if not each detail and each conspirator. See United States v. Diaz, 876 F.2d 1344, 1354 (7th Cir.1989); United States v. Marks, 816 F.2d 1207, 1209 (7th Cir.1987); see generally United States v. Burrell, 963 F.2d 976, 988 (7th Cir.) ("The jury also may consider overt acts in furtherance of the conspiracy as circumstantial evidence establishing knowing participation in a conspiracy,"), cert. denied, 113 S.Ct. 357 (1992). Cf. United States v. Osborne, 931 F.2d 1139, 1159 (7th Cir.1991) ("the courier performs an important conveyance and/or transportation function in a drug conspiracy and is a necessary culpable member who helps insure the success of the overall conspiratorial drug distribution scheme"). Taylor's conflicting explanations for the cash found in his suitcase on the occasion of his last trip to Milwaukee in particular tend to confirm that Taylor knew what illicit ends his trips were serving. See United States v. McCarthur, 6 F.3d 1270, 1280 (7th Cir.1993). The inference that Taylor was a knowing participant is further bolstered by the evidence indicating that Taylor was familiar with a number of other members of the conspiracy and had contact with them on the occasion of his own trips to Milwaukee. See Marks, 816 F.2d at 1211-12; see also Burrell, 963 F.2d at 991; United States v. Smith, 995 F.2d 662, 668 (7th Cir.1993), cert. denied, 114 S.Ct. 718 (1994). His possession of mobile phone documentation and a driver's license with false information is also consistent with his involvement in the conspiracy, as mobile phones are tools of the drug trade and the address on the driver's license was that of Sims' mother, suggesting more than a fleeting alliance with Sims. See United States v. Duarte, 950 F.2d 1255, 1260 (7th Cir.1991), cert. denied, 113 S.Ct. 174 (1992); United States v. Calvo, 865 F.2d 823, 827 (7th Cir.1988), cert. denied, 490 U.S. 1023, 109 S.Ct. 1750 (1989). Finally, the evidence concerning the undercover agents' unsuccessful attempt to purchase cocaine from Taylor in Los Angeles, which the district court admitted under Fed.R.Evid. 404(b), arguably helps to confirm that his intent was to distribute cocaine, although the amount involved in those negotiations was relatively small and it is not clear where Taylor would have procured the cocaine. In sum, we find the evidence sufficient to support Taylor's conviction for conspiracy and therefore affirm his conviction on Count One of the superseding indictment.
 
 
 49
 2. Sufficiency of the Evidence--Attempted Possession of Six Kilograms of Cocaine on July 7, 1988 (Count Three)
 
 
 50
 The government concedes that this conviction should be reversed. According to the government, the evidence indicated that Taylor joined the conspiracy as a courier no earlier than October, 1988, months after this attempt. Under United States v. Covelli, 738 F.2d 847, 859 (7th Cir.), cert. denied, 468 U.S. 867, 105 S.Ct. 211 (1984), Taylor cannot be held to account for substantive offenses committed by co-conspirators prior to his joining the conspiracy. We therefore reverse Taylor's conviction on Count Three of the superseding indictment and remand for resentencing.
 
 
 51
 3. Sufficiency of the Evidence--Travel Act--Interstate Travel to Facilitate Cocaine Trafficking on March 15, 1989 (Count Four)
 
 
 52
 This count stems from the seizure of money from Taylor's luggage at Mitchell Airport. Taylor had flown to Milwaukee from Los Angeles earlier the same day with Corey Sims. Phone records indicated that upon arrival in Milwaukee at 6:30 a.m., Taylor called Roosevelt Williams, who (as we have noted) distributed Sims' cocaine in Milwaukee and had acted as a courier as well. See Tr. 556-57. Taylor subsequently checked into a local hotel, checked out, and was back at the airport by 10:40 a.m. Tr. 328-29. Security personnel then stopped Taylor when they discerned a suspicious object in his suitcase. Tr. 294-300. That object turned out to be two shoe boxes containing the $69,950 in cash. Tr. 296-300.
 
 
 53
 In order to sustain a Travel Act conviction, the evidence must establish that the defendant travelled in interstate commerce with the intent to "distribute the proceeds of any unlawful activity" or to "otherwise promote, manage, establish [or] carry on ... any unlawful activity," and thereafter did or attempted to do so. 18 U.S.C. Sec. 1952(a). The Act defines "unlawful activity" to include "any business enterprise involving ... narcotics or controlled substances." Sec. 1952(b). To constitute a "business enterprise" for purposes of the Travel Act, "the activities must be part of a 'continuous course of conduct.' " United States v. Muskovsky, 863 F.2d 1319, 1327 (7th Cir.1988) (quoting United States v. Corbin, 662 F.2d 1066, 1072 (4th Cir.1981)), cert. denied, 489 U.S. 1067, 109 S.Ct. 1345 (1989). Moreover, the travel which supplies the basis for the charge " 'must relate significantly, rather than incidentally or minimally, to the illegal activity.' " Id. (quoting United States v. Raineri, 670 F.2d 702, 717 (7th Cir.), cert. denied, 459 U.S. 1035, 103 S.Ct. 446 (1982)).
 
 
 54
 We again begin with the observation that the evidence was more than sufficient to prove that Sims had established a courier network for the delivery of cocaine to Milwaukee and return of the proceeds to Los Angeles. This and other evidence concerning the overall scope of the conspiracy amply establishes the requisite "business enterprise." See Muskovsky, 863 F.2d at 1327. In that context, the jury could reasonably infer that Taylor was making this trip for Sims (as Tim Eastern's testimony suggests) and that the purpose of the trip was to retrieve drug proceeds (if not to drop off a shipment of cocaine as well). The circumstances of his trip, in particular his travel to Los Angeles with another conspirator, his very short turn-around time, and the large amount of cash found on his person as he prepared to return to Los Angeles, tend to eliminate any alternate explanations for his travel. The evidence was therefore more than sufficient to prove that Taylor traveled in interstate commerce in order to facilitate cocaine trafficking. Quite clearly this travel related significantly to the affairs of the conspiracy, and thus it represented a sound basis for his conviction under the Travel Act. We therefore affirm Taylor's conviction on Count Four of the superseding indictment.
 
 
 55
 4. Sufficiency of the Evidence--Attempted Possession of Four Kilograms on March 9, 1990 (Count Eight)
 
 
 56
 This involves the controlled delivery of cocaine to Sims and Ellison that police attempted unsuccessfully after Carolyn Baker was arrested in possession of the cocaine in Los Angeles. See Tr. 167-73. There was no evidence that Taylor had anything to do with this transaction. Instead, the government contended (and the jury apparently agreed) that Taylor was liable for the attempt under Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180 (1946), due to his membership in the conspiracy. See United States v. Smith, 962 F.2d 923, 929 n. 2 (9th Cir.1992); see generally United States v. Gutierrez, supra, 978 F.2d at 1467-68; United States v. Campione, 942 F.2d 429, 438 (7th Cir.1991). Taylor contends that he was no longer a member of the conspiracy by this time, and thus cannot be held liable under Pinkerton.
 
 
 57
 As the government notes, the burden is on the defendant to prove his withdrawal from the conspiracy. United States v. DePriest, 6 F.3d 1201, 1206-07 (7th Cir.1993). We have held repeatedly that merely by ceasing his participation in the conspiracy a defendant does not absolve himself of responsibility for the subsequent acts of his co-conspirators in furtherance of the conspiracy. Id. at 1206 (collecting cases). Instead, "a conspirator affirmatively must make his withdrawal known either by confessing to the police or by clearly communicating to his co-conspirators that he had abandoned the venture." Id. Taylor does not point to any evidence in the record that he withdrew from the conspiracy. Instead, he seems to rely solely on the fact that he was no longer actively participating in the conspiracy as of March 1990. This is not enough to establish his withdrawal. Id. at 1206-07.
 
 
 58
 As we have noted, the jury could reasonably infer that Taylor was still involved in the conspiracy as of March of 1989, when Taylor travelled to Milwaukee and the money was seized from his luggage as he prepared to return to Los Angeles. Even if we assume that this was the last act he took in furtherance of the conspiracy, the passage of one year in and of itself does not suggest his withdrawal. Indeed, the fact that Sims hired an attorney for Taylor to seek return of the seized money could be read to suggest that Taylor remained a member of the conspiracy.
 
 
 59
 The only remaining questions are whether the evidence was sufficient to establish that Sims and Ellison attempted to possess the cocaine and whether that attempt was a reasonably foreseeable act in furtherance of the conspiracy. The rules governing attempt charges are straightforward. The government must prove that Taylor "acted with specific intent to commit the underlying offense, and in addition took a substantial step toward its completion." United States v. Cea, 914 F.2d 881, 887 (7th Cir.1990). We think the evidence sufficient to establish that both Sims and Ellison attempted to possess the cocaine on March 9, 1990. After Baker arrived in Milwaukee in the company of the authorities, she followed routine procedure and paged Sims in order to arrange a pickup of the cocaine. Shortly after she and Sims spoke by telephone, Sims and Ellison arrived at her house. The jury could reasonably infer that they stopped by in order to retrieve the cocaine. At the same time, because this attempted transaction was a routine step in the distribution chain, and given Taylor's experience as a courier in that chain, it was a transaction reasonably foreseeable to him, and thus attributable to him under Pinkerton. We therefore affirm Taylor's conviction on Count Eight of the superseding indictment.
 
 
 60
 4. Introduction of Tax Return Evidence in Rebuttal
 
 
 61
 In an effort to explain why he had $69,950 in cash with him in Milwaukee on March 15, 1989, Taylor contended at trial that he had brought the money to Milwaukee to help his children buy property and that he had earned the money legitimately. See Tr. 702-05. Toward that end, he submitted copies of what purported to be his IRS returns for 1987 and 1988, which reflected income of $112,788 and $135,120, respectively. Tr. 720; Taylor Ex. 1, 2. In rebuttal, the government offered into evidence copies of the 1984, 1986, 1987, and 1988 returns Taylor had produced in the civil action in which he sought return of the seized money. Tr. 748-50; Gov.Ex. 408-11. Consistent with Taylor's contention at his criminal trial, these returns reflected income of $45,238 in 1984, $87,666 in 1986, $112,788 in 1987, and $135,120 in 1988. However, the government also introduced certified copies of the tax returns that Taylor had actually filed in these years, together with the IRS transcripts of account prepared in conjunction with these returns. Tr. 753-61, Gov.Ex. 401-07. These documents reflected adjusted gross income of $9,954 in 1984, $15,220 in 1985, $17,666 in 1986, and $16,572 in 1987. Taylor had not yet filed a return for 1988. Taylor contends that the admission of this evidence was improper and prejudicial.
 
 
 62
 In our view, the evidence was appropriate rebuttal. Taylor offered the 1987 and 1988 returns in order to show that he had a legitimate source of income which would explain his ability to carry such a large sum of cash. The admission of the other returns Taylor had produced in the civil action, coupled with proof of the actual returns Taylor had filed with the IRS, tended to show that Taylor's story was concocted. Not all of these returns might have been relevant standing alone, given that Taylor had only offered returns for 1987 and 1988, but considered in light of the apparently phony returns Taylor had offered at trial, the returns introduced by the government suggested an effort to falsify the source of the seized funds. Thus, the district court did not abuse its discretion in admitting the evidence. See United States v. Briscoe, 896 F.2d 1476, 1500 (7th Cir.) (in narcotics cases, defendant's failure to file tax returns admissible to show that defendant lacked legitimate source of income), cert. denied, 498 U.S. 863, 111 S.Ct. 173 (1990).
 
 
 63
 5. Admission of Evidence Concerning Efforts to Purchase Cocaine from Taylor in August, 1989
 
 
 64
 The district court permitted the government to establish that in August 1989, an undercover agent had attempted to purchase a quarter kilogram of cocaine from Taylor. As we have noted, after two unsuccessful negotiation sessions, the agent made the purchase from "Duck," and Taylor arrived while the purchase was in progress. Tr. 368-80. The court allowed this evidence pursuant to Rule 404(b).
 
 
 65
 The district court did not abuse its discretion in admitting this evidence. Although the transaction with Taylor was never consummated, the negotiations themselves arguably established his willingness to distribute cocaine, which in turn was relevant to his intent to join the charged conspiracy. As the government notes, conspiracy is a specific intent crime, and precedent in this circuit renders intent evidence admissible under Rule 404(b) in this context regardless of whether the defendant has put intent at issue. United States v. Monzon, 869 F.2d 338, 344 (7th Cir.), cert. denied, 490 U.S. 1075, 109 S.Ct. 2087 (1989). In any event, Taylor's defense would seem to have put his intent in issue, since he claimed the lack of evidence to show that he became a participant in the conspiracy. See Tr. 985-95.
 
 
 66
 6. Finding at Sentencing that Taylor was Responsible for Between Fifteen and Forty-Nine Kilograms of Cocaine
 
 
 67
 Taylor argues that the district court had no basis other than pure speculation for the conclusion that he should be deemed responsible for between fifteen and forty-nine kilograms of cocaine. This is a finding of fact, subject to review under a "clearly erroneous" standard. United States v. Hoffman, 957 F.2d 296, 300 (7th Cir.1991), cert. denied, 112 S.Ct. 2315 (1992). "In a drug conspiracy, each conspirator is responsible not only for amounts with which he was directly involved, but also for amounts involved in transactions by co-conspirators that were reasonably foreseeable to him." United States v. Paters, No. 92-3816, slip op. at 5 (7th Cir. Feb. 8, 1994); U.S.S.G. Secs. 2D1.1(a)(3), 1B1.3(a). The government contends that the fifteen to forth-nine kilogram range was appropriate, because the evidence showed that Taylor had made at least three courier trips by train to Milwaukee beginning in at least February 1989 and that Carolyn Baker and Rita Brown had made similar trips prior to the termination of the conspiracy in March 1990.
 
 
 68
 Having reviewed the record, we find it necessary to vacate the sentence and remand so that the district court can render more specific findings that would justify attributing at least fifteen kilograms of cocaine to Taylor. The district court declined to articulate a basis for arriving at fifteen kilograms, observing that "it's not necessary for the Court to be arithmetically precise in determining the amount of drugs that a defendant is involved with or responsible for under the guidelines. Rather, we are to find a general zone of responsibility that fairly reflects the conduct of the defendant." Taylor Sent. Tr. 9-10. Although we agree that the court need not calculate the drug quantity with apothecarial precision, it is nonetheless obligated to identify with some specificity its means of arriving at the total for which it deems an individual defendant responsible. United States v. DePriest, supra, 6 F.3d at 1213-14. The district court did not do so, and unfortunately, neither did the government or the probation officer. See PSR p 93 & Addendum at 2; Taylor Sent. Tr. 8-9. Given the large quantities of cocaine that this conspiracy handled, the fifteen-kilogram figure may well be justified, even conservative. For example, Taylor himself appears to have made at least three trips to Milwaukee from Los Angeles beginning in February 1989, and although there was no direct evidence that Taylor carried cocaine with him on these occasions, the district court might reasonably infer that he did so. Other couriers made similar trips to Milwaukee both before and after Taylor, carrying with them multi-kilogram quantities of cocaine. Provided these trips were reasonably foreseeable to Taylor, he may be held to account for the amounts involved. But the record does not supply a ready basis to determine the amounts Taylor and other couriers may have carried on each trip, nor is there any other immediately apparent ground on which to conclude either that Taylor himself dealt with fifteen or more kilograms of cocaine or that others did so in a manner that was reasonably foreseeable to him. Thus, without more detailed findings, we are unable to determine whether the district court's conclusion was clearly erroneous or not. We therefore remand for further findings on this subject.
 
 B. Milton Sims
 
 69
 1. Sufficiency of the Evidence--Attempted Possession of Six Kilograms on July 7, 1988 (Count Three)
 
 
 70
 This conviction rests upon the controlled delivery of the Federal Express packages containing cocaine that the authorities attempted to make to Linda Williams. Williams refused to accept the package sent to her on Sims' advice. As we noted preciously, Sims was tipped off when the packages did not arrive on time. See Tr. 145, 497-501; Brown Tr. 16, T. Eastern Tr. 66-67; see also Tr. 578; Ex. 536. Sims now argues that he cannot be convicted of attempt when he instructed Williams not to accept the package.
 
 
 71
 An attempt charge requires an intent to commit the underlying offense plus a substantial step towards its completion. United States v. Cea, supra, 914 F.2d at 887. We find the evidence sufficient to support the charge here. Sims was intimately involved in the oversight of the cocaine deliveries via the Federal Express system. Tr. 129-135, Baker Tr. 5-17, Brown Tr. 5-10; Eastern Tr. 29-31. Indeed, the fact that Sims could direct Williams not to accept the package suggests that his involvement and direction did not cease when the cocaine left Los Angeles, but instead extended through receipt of the contraband in Milwaukee. In this case, the cocaine had been procured and sent on its way, and had Sims not telephoned Williams and told her to refuse delivery of the package, the cocaine would have returned to his constructive possession in Milwaukee.[3] And although Sims did instruct Williams not to accept the package (Tr. 145; Brown Tr. 16), he did so only because he suspected the package had been intercepted (Eastern Tr. 66-67). In this sense, he is no better off than a burglar who abandons his villainy when the alarm sounds. Having originally harbored the intent to take possession of the cocaine in Milwaukee through his subordinates, and having taken steps to accomplish that end through the courier system, Sims is culpable for the crime of attempt despite his last minute change of heart. See United States v. Rovetuso, 768 F.2d 809, 821-22 (7th Cir.1985), cert. denied, 474 U.S. 1076, 1106, 106 S.Ct. 838, 1951 (1986); Fryer v. Nix, 775 F.2d 979, 993-94 (8th Cir.1985). We therefore affirm Sims' conviction on Count Three of the superseding indictment.
 
 
 72
 2. Sufficiency of the Evidence--Possession of a Handgun in Relation to a Drug Trafficking Offense (Count Seven)
 
 
 73
 The government concedes error in this conviction. Accordingly, we reverse Sims' conviction on Count Seven and remand for resentencing.
 
 
 74
 3. Sufficiency of the Evidence--Attempted Possession of Four Kilograms on March 9, 1990 (Count Eight)
 
 
 75
 This charge arises from the controlled delivery that the authorities attempted to make in Milwaukee after Carolyn Baker had been arrested in Los Angeles with the cocaine in her possession. See Tr. 167-174. As we have previously recounted, when Baker and the authorities arrived in Milwaukee, she contacted Sims to have the cocaine picked up, as she and Brown normally did. Baker Tr. 47-48. Shortly after she beeped Sims, he arrived at her house with Darryl Ellison. At that point, Baker revealed to Sims that she had been arrested and that the police were in the house. Baker Tr. 49-50. Sims and Ellison fled, but Sims was caught. Sims maintains that the evidence was insufficient to show that he had gone to the house in order to retrieve the cocaine.
 
 
 76
 Again we find the evidence sufficient to support the attempt conviction. Sims' network had sent the cocaine on its way to Milwaukee and the cocaine indeed arrived, albeit in the company of the authorities. See Baker Tr. 41-45; Tr. 247-53. The circumstances suggest that Sims was prepared to pick up the cocaine from Baker and that only Baker's last-minute disclosure that the police were present stopped that from happening. See Part B(1), supra. We therefore affirm Sims' conviction on Count Eight of the superseding indictment.
 
 4. Admission of Tax Information
 
 77
 In an attempt to cast an innocent light on his activities, Sims presented several witnesses who testified that from 1987 on Sims had been steadily employed selling mobile phones and beepers, working for an electronic plating company, and also working in a family trucking business. Tr. 631-32, 653-54, 656. In rebuttal, the government offered evidence indicating that Sims had filed no tax returns for 1987 and 1988, and in 1986 had filed a return showing income of only $1,157. Tr. 759-61.
 
 
 78
 The district court did not abuse its discretion in allowing this evidence. The time frame of the evidence corresponds with the alleged conspiracy (1986 on), and tends to support the inference that, contrary to his defense, Sims had not earned legitimate income during this period. United States v. Briscoe, supra, 896 F.2d at 1500.
 
 C. Frank Arms
 
 79
 1. Sufficiency of the Evidence--Conspiracy (Count One)
 
 
 80
 Arms contends that the evidence was insufficient to sustain his conviction on the conspiracy charge because, at most, it established a mere buyer-seller relationship between him and other members of the conspiracy. However, as the government points out:
 
 
 81
 Even if the relationship between the accused and the other members of the conspiracy is that of buyer-seller, ... "a conspiracy may yet be proved by evidence of a concert of action." [ United States v. Koenig, 856 F.2d 843 (7th Cir.1988) ] at 854; United States v. Creamer, 555 F.2d 612, 615 (7th Cir.1977). "An ongoing relationship involving the distribution of drugs is evidence of a concert of action." Koenig, 856 F.2d at 854; [ United States v. Mancillas, 580 F.2d 1301 (7th Cir.), cert. denied, 439 U.S. 958, 99 S.Ct. 361 (1978) ] at 1307.
 
 
 82
 United States v. Douglas, 874 F.2d 1145, 1152 (7th Cir.), cert. denied, 493 U.S. 841, 110 S.Ct. 126 (1989); see also United States v. Lechuga, 994 F.2d 346, 349-50 (7th Cir.) (en banc), cert. denied, 114 S.Ct. 482 (1993).
 
 
 83
 Viewed favorably to the government, the evidence was sufficient to sustain the conspiracy conviction. Beginning in 1987, Arms purchased kilogram quantities of cocaine from or through Milton Sims, Tim Eastern, "Tooter" Ellison, Linda Williams, and Jim McGee. Tr. 114-16; 172-74; 176-82; 324-28; 580-81. On some occasions, Arms paid up front for the cocaine, but at others, the cocaine was "fronted" to him. E.g., Tr. 326-27. The latter arrangement suggests, contrary to Arms' argument, a stake in the success of the conspiracy. Phone records also revealed extensive contacts with other members of the conspiracy from 1987 to 1990. Gov.Ex. 543-46. All of these facts suggest an ongoing relationship involving the distribution of drugs and thus membership in the conspiracy. See Douglas, 874 F.2d at 1152-1153. We therefore affirm Arms' conviction on Count One of the second superseding indictment.
 
 
 84
 2. Sufficiency of the Evidence--Attempted Possession of Six Kilograms on July 7, 1988 (Count Three)
 
 
 85
 This charge arises from the attempt to make a controlled delivery of the two Federal Express packages of cocaine to Linda Williams, who refused the packages at Sims' instruction. Tr. 330. Arms contends that the evidence was insufficient to sustain his conviction for attempted possession of this cocaine. The government relies upon the following evidence:
 
 
 86
 (1) Linda Williams testified that Arms and "Wee Wee" were the sole recipients of the kilograms of cocaine she received from Los Angeles. Tr. 324-28.
 
 
 87
 (2) Phone toll analysis indicated that calls were placed from a phone associated with Milton Sims to Arms' residence twice on July 1, 1988. Tr. 962; Gov.Ex. 546. "Presumably, the logistics of the transaction were being discussed." Gov.Br. at 71.
 
 
 88
 (3) On July 9, 1988, three calls were placed from Arms' residence to a phone and beeper number in Los Angeles associated with Sims. Tr. 958; Gov.Ex. 536. Again, the government argues that "it is reasonable to infer that the lost shipment of cocaine was their main topic of discussion." Gov.Br. 71.
 
 
 89
 We find this evidence inadequate to sustain the conviction for attempted possession. As we have noted, an attempt charge requires proof that the defendant "acted with specific intent to commit the underlying offense, and in addition took a substantial step toward its completion." Cea, 914 F.2d at 887. At trial, Williams testified that on each of the three to five occasions she had received Federal Express shipments of cocaine, Arms had come to her home and purchased at least a portion of the shipment. Tr. 326. Perhaps, in light of that testimony and the phone records reflecting continued contact between Arms and Sims, the jury might reasonably have inferred that Arms had the requisite intent to possess the cocaine involved in the aborted delivery. What the evidence fails to establish, however, is a substantial step by Arms toward the possession of this particular shipment. If, for example, the evidence revealed that Arms placed an order during one of the telephone calls reflected in the record, or in some other way made concrete arrangements with Sims for the July 9th shipment, that might be enough to establish Arms' attempt to possess the cocaine. See United States v. Jonsson, No. 93-1531, 1994 WL 25083, * 3, 15 F.3d 759 (8th Cir. Feb. 2, 1994); United States v. Argencourt, 996 F.2d 1300, 1303 (1st Cir.1993), cert. denied, 114 S.Ct. 731 (1994); United States v. Pennyman, 889 F.2d 104, 107 (6th Cir.1989). But although the government suggests that this is exactly the kind of discussion Arms and Sims were having, in fact the jury could only have speculated on that point, for the government had no evidence revealing what Arms and Sims discussed (or even that it was Arms and Sims acutally speaking). Thus, although the chronology of the phone calls renders it possible that Arms and Sims were discussing the ill-fated shipment (see generally United States v. Marks, supra, 816 F.2d at 1211-12), it did not reasonably permit the jury to so find beyond a reasonable doubt.[4] We are therefofe compelled to reverse Arms' conviction on Count Three of the second superseding indictment and remand for re-sentencing.
 
 
 90
 3. Sufficiency of the Evidence--Possession of Cocaine on September 2, 1988 (Count Four)
 
 
 91
 On September 2, 1988, Ann Love and "Tooter" arrived in Milwaukee with a suitcase full of cocaine, which was taken to Nathan Holloway's house. The government concedes that "[t]here is no direct evidence ... as to which distributors ultimately received the cocaine." Gov.Br. 71. Nonetheless, the government maintains that Arms may be held liable for possessing this shipment, based upon the following:
 
 
 92
 (1) Arms received kilograms quantities of cocaine from Sims on other occasions. Tr. 115-16, 172-75, 176-78, 324-28.
 
 
 93
 (2) Circumstantial evidence indicates that Arms remained involved with Sims and the other conspirators until the date of Sims' arrest on March 9, 1990. This evidence includes records of phone activity, the phone lists taken from Sims and Brown when they were arrested, and the items found in the search of Arms' residence. Tr. 744-50; 908-14; 916-18; Gov.Ex. 156, 178, 278, 278A, 384, 385.
 
 
 94
 (3) Circumstantial evidence also suggests, in the government's view, that Arms had an interest in this particular shipment of cocaine. Phone records reveal that on September 1, 1988, a call was placed from Arms' residence to a Los Angeles business phone associated with Milton Sims. Tr. 961; Gov.Ex. 961. On September 3, 1988, a call was placed from a number associated with Sims to Arms' residence. Tr. 962; Gov.Ex. 546.
 
 
 95
 We must reverse Arms' conviction on this count as well. Certainly the evidence that the government has cited makes it possible that Arms received this shipment of cocaine, given his prior purchases and his continued contact with other conspirators. But there were other distributors, and the government has cited no evidence that would reasonably permit a jury to conclude that this particular shipment was destined for Arms. In this respect, the evidence is far weaker than the evidence concerning the preceding attempt charge, for there is no equivalent to Linda Williams' testimony that Arms was always a recipient of her shipments. The solitary phone call from Arms' number to Sims' on the day before the arrival of Love and "Tooter" does not sufficiently tie Arms to the shipment--for all we know, Arms may have told Sims he was not interested in the shipment or offered a price that Sims declined. Or perhaps they discussed baseball. Only speculation enables the conclusion that the cocaine found its way to Arms in this instance. Accordingly, we reverse Arms' conviction on Count Four of the second superseding indictment.
 
 
 96
 4. Sufficiency of the Evidence--Attempted Possession of Four Kilograms on March 9, 1990 (Count Seven)
 
 
 97
 Once again, this is the attempted controlled delivery through Baker to Sims and Darryl "Tooter" Ellison. Because Sims and Ellison fled from the scene when Baker disclosed that she had been arrested and the police were present, we do not know to whom Sims and Ellison would have given the cocaine. The government concedes that there is no direct evidence that Arms was still involved in the conspiracy at this point. Gov.Br. 73. Nonetheless, it relies upon the following circumstances to support the notion that Arms likely remained active and received the cocaine:
 
 
 98
 (1) A handwritten list of nine phone numbers found on Sims at the time of his arrest included Arms' number. Tr. 916; Gov.Ex. 178, 384.
 
 
 99
 (2) A similar list of seven numbers retrieved from Brown at the time of her arrest included Arms' number. Tr. 918; Gov.Ex. 156, 385.
 
 
 100
 (3) Phone records disclose that on March 2, 1990, Arms placed four calls from his mobile phone to Sims' beeper (Tr. 962, Gov.Ex. 545), and a call was placed from a mobile phone used by Sims and "Tooter" to Arms' residence (Tr. 962, Gov.Ex. 546).
 
 
 101
 We find the evidence as to this charge wanting for the same reasons we have articulated as to the preceding two counts. This evidence may tend to show Arms' continuing association with the other conspirators. But absent some evidence as to what Arms may have discussed with Sims and "Tooter," there is nothing to tie him to this particular shipment of cocaine. We therefore reverse Arms' conviction on Count Seven of the second superseding indictment.
 
 
 102
 5. Admission of guns and cocaine found in Arms' residence
 
 
 103
 The district court permitted the government to introduce evidence that a loaded .44 caliber revolver and a loaded Baretta 380 semi-automatic pistol, along with an "eight ball" quantity (one-eighth of an ounce) of cocaine were found in the search of Arms' residence. Tr. 745-47; Gov.Ex. 284, 282. A small quantity of marijuana was also found in Arms' home, but was not offered into evidence. The district court agreed with the government that the cocaine was admissible either as substantive evidence of the conspiracy or, at the very least, Rule 404(b) evidence bearing on Arms' intent. Tr. 765-67. The court noted that there was no evidence the cocaine was for personal use. Tr. 766. The guns were admitted as "tools of the trade." Tr. 765-77. Arms contends that the evidence was irrelevant and prejudicial.
 
 
 104
 As the government notes, we have held that weapons are admissible in drug cases as hallmarks of the narcotics trade. See United States v. Alvarez, 860 F.2d 801, 829 (7th Cir.1988), cert. denied, 490 U.S. 1051, 109 S.Ct. 1966 (1989). We therefore discern no basis to conclude that the district court abused its discretion in admitting evidence of the two guns.
 
 
 105
 Likewise we discern no abuse of discretion in admitting evidence of the cocaine. The small quantity might not have been particularly probative as substantive evidence of the conspiracy; after all, according to the government, Arms was receiving multi-kilogram quantities from Sims. And if the cocaine was indeed intended for Arms' personal use, it might not have been admissible. See United States v. Troop, 890 F.2d 1393, 1401 n. 12 (7th Cir.1989). However, this was not the only possibility: this may have been cocaine that Arms was prepared to sell to someone else for personal use, for example. Because we think the record permitted that inference, and because conspiracy is a specific intent crime, we think the cocaine had some probative value with respect to Arms' knowledge and intent.
 
 
 106
 6. Sentencing Calculation of Amount of Cocaine Attributed to Arms
 
 
 107
 The presentence report recommended that Arms be held responsible for fifty to 150 kilograms of cocaine, a quantity resulting in a base offense level of 36. Arms PSR p 120. The district court ultimately found Arms responsible for between fifteen and fifty kilograms, resulting in a base offense level of 34. Sent.Tr. 21. Arms contends that the court "abused its discretion" in doing so, presumably meaning that the district court's finding as to the amount of cocaine was clearly erroneous. The government argues that the amount is justified on two grounds: (1) Arms was involved in the conspiracy from 1987 until its termination in 1990 (and can thus be held to account for all foreseeable amounts that may be attributed to the conspiracy as a whole); (2) the amounts charged in the possession charges on which Arms was convicted alone total over fifteen kilograms.
 
 
 108
 Because we have reversed Arms' conviction on three substantive counts that together involve approximately fifteen kilograms of cocaine, on remand the district court, consistent with our remarks supra at 31-32, should consider anew the quantities of cocaine that may be attributed to Arms either because he was directly involved in the relevant transactions or because the transactions were reasonably foreseeable to him as a member of the conspiracy.
 
 D. Nathan Holloway
 
 109
 1. Sufficiency of the Evidence--Conspiracy (Count One)
 
 
 110
 Holloway argues that the evidence was not sufficient to demonstrate his participation in the conspiracy. The government cites the following evidence in response:
 
 
 111
 (1) Tim Eastern testified that he arranged for Holloway to deliver one kilogram of Sims' cocaine to Errol Jackson in the Summer of 1988 (Tr. 123-25); he learned later from both Holloway and Sims that Holloway continued to deliver cocaine to Jackson after that. Tr. 125-26; see also Tr. 169-70. Phone records suggest contacts between Holloway and Jackson, as well as between Holloway, Sims, Eastern and other members of the conspiracy beginning in 1987 and continuing through September of 1989. Tr. 951, 952-54, 958-60, 962-65, 967; Gov.Ex. 516-17, 525A, 536-39; 547-54; 556-62.
 
 
 112
 (2) Ann Love testified that in August 1988, when she and Tooter arrived in Milwaukee with a suitcase full of cocaine, Holloway and Eastern met her at the bus station, and then Holloway drove her to his grandparents' house, took possession of the cocaine, drove her to a hotel, checked her in under his name and paid for the room, and returned the next day with money for her and Tooter to fly back to California. Tr. 359-65. Eastern corroborated this account, adding that he was present at the Holloway home when Love's suitcase was opened, revealing the cocaine inside. Tr. 133-35; see also Tr. 924-25; Gov.Ex. 317.
 
 
 113
 We find this evidence more than sufficient to demonstrate an active role in the conspiracy. The fact that Holloway knowingly delivered kilogram quantities of cocaine to Jackson on Sims' behalf on multiple occasions and coordinated Ann Love's delivery of a multi-kilogram shipment from Milwaukee amply demonstrate his awareness of the nature of the conspiracy, his intent to join the conspiratorial agreement, and his affirmative efforts in cooperation with other coconspirators to carry on the affairs of the conspiracy. See United States v. Morrison, 946 F.2d 484, 497 (7th Cir.1991) (evidence that defendant, inter alia, worked as a courier and was present when shipment of cocaine was unloaded sufficient to establish his agreement to distribute cocaine), cert. denied, 113 S.Ct. 826 (1992). We therefore affirm Holloway's conviction on Count One of the second superseding indictment.
 
 
 114
 2. Sufficiency of the Evidence--Possession of Cocaine on September 2, 1988 (Count Four)
 
 
 115
 This charge rests upon Ann Love's delivery of cocaine to Holloway as described immediately above. Holloway argues that the evidence is insufficient to demonstrate his involvement with this shipment of cocaine. In addition to the conduct outlined above, the government notes that Errol Jackson, a kilogram customer of Sims and Holloway, called Holloway three times on September 2, 1988 and once more the following day; a call was also placed on September 2, 1988 from a phone associated with Sims to Holloway's residence. Tr. 951, 963; Gov.Ex. 516, 550.
 
 
 116
 In view of the testimony of Ann Love and Tim Eastern, we have no doubt that the jury could reasonably conclude that Holloway came into possession of this shipment of cocaine. The phone calls are consistent with the government's theory, although for the reasons we have articulated earlier, they do not shed much light on what Holloway may have been thinking, saying, or doing with respect to this shipment of cocaine. But see United States v. Marks, supra, 816 F.2d at 1211-12. Nonetheless, by Love's account, Holloway not only picked her up with the cocaine shipment, but took it from her when they arrived at his home and delivered the payment to her on the following day. We therefore affirm Holloway's conviction on Count Four of the second superseding indictment.
 
 
 117
 3. Refusal to Give Missing Witness Instruction re. Gerry McCoy
 
 
 118
 During the course of its investigation, the government monitored two phone calls between an informant, Gerry McCoy, and Holloway. According to the government, the purpose of the calls was to find out whom Holloway would contact as his supplier of cocaine. Phone records indicated that after both of the calls, Holloway paged Sims at his Los Angeles beeper. Tr. 940-41. No narcotics transaction was ever consummated as a result of these calls. The government did not call McCoy as a witness, although the recordings of the phone calls and the records of the (purported) followup calls that Holloway made to Sims' beeper were introduced at trial. Tr. 938-40, 952-54; Gov.Ex. 304, 304A, 304B, 525A. Holloway contends that the district court erred in refusing his request for a missing witness instruction regarding McCoy.
 
 
 119
 A missing witness instruction requires a showing that the witness is peculiarly within the power of the government and has testimony relevant to the issues in the case. United States v. Cochran, 955 F.2d 1116, 1123 (7th Cir.), cert. denied, 113 S.Ct. 460 (1992); United States v. Romo, 914 F.2d 889, 893-94 (7th Cir.1990), cert. denied, 498 U.S. 1122, 111 S.Ct. 1078 (1991). As the government points out, Holloway has made no showing that McCoy was unavailable to him, e.g., that he could not have subpoenaed McCoy or that the government refused to cooperate in producing him. Holloway's failure to make such a showing disposes of this issue. Id. Moreover, even if we were to indulge Holloway with the assumption that the failure to give the instruction was erroneous, he has not offered us any compelling reason to believe that the error was not harmless.
 
 
 120
 4. Admission of the McCoy--Holloway Taped Conversations
 
 
 121
 Holloway also argues that the phone conversations between himself and McCoy should not have been admitted in the first place. He maintains that an "objective analysis" of the content of the calls reveals that they were not related to drug trafficking; indeed, his theory at trial was that McCoy wanted him to locate some sportswear that he was interested in and that Holloway had purchased from Milton Sims in the past. Tr. 1319, 1335.
 
 
 122
 Our review of the tape and transcripts persuades us that the two conversations could be construed to concern a prospective narcotics transaction. Note the following exchange, for example:
 
 
 123
 McCoy: So, what's up, ya know. You don't know.
 
 
 124
 Holloway: I don't know. My homey's got his pager cut off right now.
 
 
 125
 McCoy: Oh.
 
 
 126
 Holloway: But, I can understand that, though. But, I'm gonna get with you, don't worry.
 
 
 127
 McCoy: Okay.
 
 
 128
 Gov.Ex. 304, 304B. The absence of any express reference to drugs is not at all unusual and does not detract from the relevance of the tapes. Particularly in light of the phone calls Holloway placed to Sims immediately after these conversations, the jury could reasonably have construed them as confirmation of Holloway's participation in the conspiracy.
 
 E. Roosevelt Williams
 
 129
 1. Sufficiency of the Evidence--Possession of Cocaine on September 2, 1988 (Count Four)
 
 
 130
 The government concedes that the evidence was not sufficient to establish Williams' liability for the shipment of cocaine that Ann Love brought to Milwaukee by bus on September 2, 1988. This delivery took place prior to Williams becoming active in the conspiracy (shortly before November 2, 1988). Accordingly, we reverse Williams' conviction on Count Four of the second superseding indictment and remand for resentencing.
 
 
 131
 2. Sufficiency of the Evidence--Use/Carrying of Firearm in Relation to Drug Trafficking Offense (Count Six)
 
 
 132
 The government also concedes error on this conviction. Accordingly, we reverse Williams' conviction on Count Six of the second superseding indictment and remand for resentencing.
 
 F. Saul Ochoa
 
 133
 1. Sufficiency of the Evidence--Conspiracy (Count One)
 
 
 134
 Ochoa argues that the evidence was insufficient to establish that he participated in a joint scheme with the other members of the conspiracy and that, at most, the government merely proved a buyer-seller relationship between himself and Milton Sims. The government describes the proof of Ochoa's guilty as "overwhelming," and cites the following evidence:
 
 
 135
 (1) Tim Eastern and Adrienne Ross both testified that Ochoa was Sims' principal source of cocaine; other suppliers were used only when Ochoa was unavailable or unable to fill Sims' order. Tr. 132-34, 136, 203, 585, 589-90, 596-97, 599, 617-18, 624-25.
 
 
 136
 (2) Ross (whom the government describes as the closest of the conspirators to Sims) also testified that she had conducted a number of transactions with Ochoa or his workers, including receiving cocaine from Ochoa and taking cash to him. Tr. 626-33. According to Ross, Ochoa had also supplied Tony Love with cocaine in 1986, when Sims began dealing with Love (Tr. 579-80); Ann Love (Tony's mother) confirmed this (Tr. 792). Ross also testified that other associates of Sims ("Tooter," Rodney Ross, and "Dog") took delivery of cocaine from Ochoa. Tr. 636.
 
 
 137
 (3) According to Ross, Eastern and Ann Love, Ochoa was affiliated with The Candy Shop, an auto body repair establishment that the evidence suggests was a nexus of contacts between the co-conspirators. Tr. 664, 792, 810-11; Gov.Ex. 581, 585, 588, 589, 593, 594, 596. Cf. Tr. 745-46 (Ochoa denies any affiliation with The Candy Shop).
 
 
 138
 (4) Phone numbers found on Ochoa at the time of his arrest were frequently called by other conspirators. Tr. 883-86; Gov.Ex. 580-84, 586-87.
 
 
 139
 (5) Although Ochoa denied contact with Sims after 1987 (Tr. 965-67), phone numbers for Sims' beeper and residence were among the numbers in Ochoa's wallet at the time of his arrest in Feb. 1991. Tr. 975, 977; see also Tr. 649-54.
 
 
 140
 Finally, the government notes that the nature and duration of Ochoa's relationship with Sims, the quantities of cocaine delivered, and the frequency of their contacts establish more than a mere buyer-seller relationship.
 
 
 141
 We agree that the evidence was more than sufficient to establish Ochoa's participation in the conspiracy. At a minimum, the evidence established repeated sales of cocaine in resale quantities to Sims and his associates. These sales, which took place over a significant period of time, tend to reflect "a continuing relation, implying an agreement with an objective beyond a simple purchase and sale and thus an agreement separate from the sale itself--the latter being an agreement, all right, but not a conspiracy." United States v. Lechuga, supra, 994 F.2d at 350 (citing United States v. Baker, 905 F.2d 1100, 1106 (7th Cir.), cert. denied, 498 U.S. 876, 904, 111 S.Ct. 206, 276 (1990), and 498 U.S. 1030, 111 S.Ct. 686 (1991)). In other words, Ochoa's "prolonged cooperation" with Sims "showed that the defendant not only knew that [he] was selling drugs to someone for use in an illicit enterprise but had 'join[ed] both mind and hand with him to make its accomplishment possible.' " Id. (quoting Direct Sales Co. v. United States, 319 U.S. 703, 712 n. 8, 63 S.Ct. 1265, 1269 n. 8 (1943)). Thus, Adrienne Ross described the essence of the relationship between Ochoa and Sims as "[m]aking money together." Tr. 597. Ochoa's continuing relationship with the conspiracy is also revealed by the fact that Ochoa frequently "fronted" the cocaine to Sims, accepting payment when the couriers returned from Milwaukee with cash. Tr. 204. This arrangement led Ochoa in one instance (described by Ann Love) to call Sims in a rage when Love delivered a cash payment that was "short." Tr. 787-89. Thus, Ochoa's role as the principal supplier of cocaine, considered together with his contact and cooperation with Sims and other members of the conspiracy, reasonably supports the inference that Ochoa was more than an indifferent wholesaler, but had, in effect, joined the conspiratorial agreement. We therefore affirm Ochoa's conviction on Count One of the third superseding indictment.
 
 
 142
 2. Sufficiency of the Evidence--Possession/Attempted Possession Counts
 
 
 143
 Ochoa was charged in Counts Two, Three, Four and Five with possession of cocaine. Although he does not dispute that he supplied cocaine to Sims and his associates, Ochoa nonetheless challenges his conviction on these counts, arguing that (1) his participation ended once the cocaine was sold; (2) there is no evidence showing that he actually possessed cocaine on any occasion or that he constructively possessed it (i.e. exercised ownership and control over it); and (3) as to the attempted possession charges, he took no substantial step toward possession.
 
 
 144
 We agree with the government, however, that given Ochoa's prolonged and cooperative partnership as the supplier of cocaine to the other members of the conspiracy, Ochoa aided and abetted their possession and attempted possession of the cocaine. "One who participates in a criminal venture and seeks by his actions to make it succeed commits the crime of aiding and abetting." United States v. Wesson, 889 F.2d 134, 135 (7th Cir.1989) (citing United States v. Pino-Perez, 870 F.2d 1230, 1235 (7th Cir.) (en banc), cert. denied, 493 U.S. 901, 110 S.Ct. 260 (1989)). The sale of cocaine to a narcotics trafficking enterprise may not in and of itself render the seller an aider and abettor. See Pino-Perez, 870 F.2d at 1235. However, given that Ochoa made repeated sales to Sims and his associates over a significant time period, supplied cocaine on a credit basis, and had continuing contact with a number of participants in the conspiracy, the jury could reasonably infer that he had associated himself with their criminal venture and had provided the cocaine with an intent to facilitate the conspirators' possession and in the hope that they would distribute the narcotic successfully. See id.; United States v. Beck, 615 F.2d 441, 449 (7th Cir.1980). Consequently, Ochoa's conviction on the possession and attempted possession counts was proper. Accordingly, we affirm his conviction on Counts Two, Three, Four, and Five of the third superseding indictment.
 
 
 145
 3. Constructive Amendment of the Indictment through Evidence of April 1987 Drug Negotiations with Undercover Drug Agent
 
 
 146
 In April 1987, Ochoa negotiated the sale of four kilograms of cocaine to an undercover agent. Following delivery of the first kilogram, Ochoa and two associates were arrested. Tr. 273-88. A consensual search of two of Ochoa's apartments produced just under a kilogram of cocaine, a scale, approximately $4,000 in cash, and four empty kilogram wrappers. Tr. 551-54. The district court permitted the government to introduce evidence of this episode as substantive evidence of the conspiracy or alternatively under Rule 404(b). Ochoa argues that this evidence effectively amended the indictment to include a charge (the April 1987 transaction) otherwise absent. The government responds that this was simply one piece of evidence proving that Ochoa was a multi-kilogram supplier of cocaine during the time period of the alleged conspiracy.
 
 
 147
 We are not convinced that this evidence was properly admitted as evidence of the conspiracy with which Ochoa was charged, although in our view the admission did not prejudice Ochoa significantly. Insofar as Ochoa was guilty of conspiracy, his culpability sprang from his sales to Sims and Sims' associates; his sales to independent buyers, in this case undercover agents, thus do not establish in any direct way his conspiratorial relationship with Sims et al. A multi-kilogram sale that occurred within the same time frame as the charged conspiracy was nonetheless relevant to Ochoa's intent, and thus could have been admitted under Rule 404(b). The district court did not give the jury a contemporaneous instruction limiting its consideration of the evidence to the question of Ochoa's intent, although it did give a generalized "other act" instruction in its final instructions to the jury when Ochoa's counsel (for the first time) requested such an instruction. Tr. 1234-35, 1239. However, in view of what we agree is the overwhelming evidence of Ochoa's participation in the charged conspiracy, we find any error to have been harmless. And because this was merely one small piece of a prosecution case which, for the most part, focused correctly on Ochoa's dealings with the other members of the conspiracy, we discern no constructive amendment of the indictment. See generally United States v. McAnderson, 914 F.2d 934, 945 (7th Cir.1990) (where there was no risk of confusion as to the nature of the charge against defendants, no constructive amendment occurred).
 
 
 148
 4. Admission of Evidence concerning Ochoa's Post-Conspiracy Telephone Conversations with Sims and Items found on Ochoa's Person at time of his 1991 Arrest
 
 
 149
 At trial, Adrienne Ross testified that on several occasions following Sims' arrest (and thus after the termination of the conspiracy), Sims called her from jail and she then initiated a three-way call including Ochoa so that Sims and Ochoa could talk. Tr. 649-51. The government argues that this was relevant to show an ongoing relationship between Sims and Ochoa. The government was also permitted to show that when Ochoa himself was arrested in February 1991, police found in his possession a digital pager, cellular and mobile phones, $1,000 in cash, and false identification bearing the false name of "Martin Garcia" that Ochoa gave the police upon his arrest. Tr. 526-27, 528-32, 537-39; Gov.Ex. 400-04. The government argues that use of the false name and identification reflected Ochoa's modus operandi of using aliases as he did during the conspiracy (see, e.g., Tr. 790: Ann Love testifies that Ochoa used "Jesse" as an alias) as well as a consciousness of guilt. It does not offer a basis for admission of the mobile phone, beeper, and cash, but contends any error in the admission was harmless. Ochoa contends for the first time on appeal that all of this evidence was improperly admitted under Rule 404(b) and suggested improperly to the jury that because Ochoa had contact with Sims and was found at the time of his arrest to be in possession of items suggesting drug activity, he must have conspired with the others as charged.
 
 
 150
 Because Ochoa failed to object to this evidence below, our inquiry is limited to whether the admission amounted to plain error. It did not. The fact of Sims' post-arrest conversations with Ochoa was probative of their relationship and thus relevant to whether or not they had been co-conspirators. See Anderson v. United States, 417 U.S. 211, 219-20, 94 S.Ct. 2253, 2260-61 (1974). This is particularly true in view of the fact that Ochoa disclaimed any contact with Sims after 1987. Tr. 965-67. The mobile phone, beeper, cash, and false identification are all hallmarks of the drug trade and were thus probative of Ochoa's involvement in that profession. United States v. Duarte, supra, 950 F.2d at 1260.
 
 
 151
 5. Admission of Co-Conspirator Statements against Ochoa
 
 
 152
 Ochoa objected to the admission of co-conspirator statements at trial. After hearing the government's case, the district court found by a preponderance of the evidence that the government had adequately proved the existence of a conspiracy involving "many, many people," including "among others Milton Sims and 'Tooter,' Rodney Ross and so on." Tr. 903. The court did not explicitly find that Ochoa was a member of the conspiracy, and Ochoa seizes upon that omission to argue that the court committed plain error in admitting the statements against Ochoa.
 
 
 153
 Although Ochoa is correct to point out that the district court is obligated to find that the defendant was a member of the charged conspiracy before co-conspirator statements may be admitted against him under Fed.R.Evid. 801(d)(2)(E), United States v. Peters, 791 F.2d 1270, 1285 (7th Cir.), cert. denied, 479 U.S. 847, 107 S.Ct. 168 (1986), the context of the court's remarks indicate that this was its finding. Although the court did not mention Ochoa by name in rendering its findings, at a minimum, its use of the phrase "and so on" clearly indicates that the list of names it mentioned was not meant to be exhaustive. Indeed, we believe the court's remarks reveal an unspoken assumption that each of the three defendants in this trial (Ochoa, Crawford, and Corey Sims) had been shown to be a member of the conspiracy and that the court's intent was simply to attempt to identify some of their other co-conspirators. In any case, whatever ambiguity there might have been as to Ochoa's status were resolved moments later, when the court denied his Rule 29(a) motion for a judgment of acquittal on the conspiracy charge, observing that there was "strong evidence" of each defendant's guilt on that count. Tr. 908. Thus, there is nothing fatal in the court's failure to name Ochoa in its findings. Moreover, given that there was, in our view, substantial evidence pointing to Ochoa's membership in the conspiracy, we discern no clear error in the court's decision to admit co-conspirator statements against Ochoa.
 
 
 154
 6. Sufficiency of the Evidence and Variance: Multiple Conspiracies vs. Single Conspiracy
 
 
 155
 Ochoa argues both that the evidence was insufficient to prove his participation in the conspiracy and that, at most, the evidence showed multiple conspiracies rather than the single conspiracy that the indictment alleged. In essence, Ochoa maintains that there was no demonstrable cohesion between the various individual members of the conspiracy, and that really there were several smaller operations working independently.
 
 
 156
 Although there may have been some peripheral players whose role, if any, in the conspiracy was tenuous or unclear, we think the evidence established with relative clarity a single cocaine trafficking conspiracy with Milton Sims at the top (supplied most frequently by Ochoa), with the various couriers taking cocaine to Milwaukee and returning to Los Angeles with cash, and with distributors and customers in Milwaukee at the bottom of the pyramid consuming the cocaine. It may be true, as Ochoa claims, that he had no particular interest in how the cocaine was distributed once he was paid for it. Yet, his status as the principal supplier, his familiarity and interaction with a number of conspirators, and his willingness to advance cocaine and await the couriers' return from Milwaukee for payment reveal an association, stake, and participation in the conspiracy that peg him as a co-conspirator himself. United States v. Townsend, supra, 924 F.2d at 1406; United States v. Douglas, supra, 874 F.2d at 1153, 1156-57; United States v. Koenig, supra, 856 F.2d at 854. It may also be that Sims and the other members of the conspiracy did not always deal exclusively with Ochoa or with one another. But conspiracies are often loosely staffed with itinerant personnel whose loyalties are divided; this does not detract from the existence or nature of the conspiratorial agreement. See Townsend, 924 F.2d at 1391. Based on the evidence showing that Ochoa was the principal supplier of fairly large quantities of cocaine to Sims and his people over several years and that Sims had built a fairly well structured and cohesive distribution network, the jury reasonably could have found the single conspiracy that the indictment alleged and that Ochoa participated in that conspiracy. See United States v. Goines, supra, 988 F.3d at 772.
 
 7. Obstruction of Justice Enhancement
 
 157
 Ochoa testified on his own behalf at trial. At sentencing, the district court found that he had testified falsely and gave him a two-level upward adjustment pursuant to section 3C1.1 of the Guidelines for obstruction of justice. Ochoa contends that the district court failed to make an adequate finding of perjured testimony to support such an enhancement. We review the district court's finding for clear error. United States v. Carson, 9 F.3d 576, 583 (7th Cir.1993), pet. for cert. filed (Jan. 28, 1994) (No. 93-7654); United States v. Pitz, 2 F.3d 723, 730 (7th Cir.1993).
 
 
 158
 There is no merit to this argument. As Ochoa himself concedes, the district court made an explicit finding on the record, independent of the jury's verdict, that Ochoa had testified falsely. Sent.Tr. 32-33. It may not have cited specific examples of what it perceived to have been Ochoa's falsehoods, but our precedents make clear that the court was not required to do so. United States v. Jones, 938 F.2d 1425, 1430 (7th Cir.1993); United States v. Casanova, 970 F.2d 371, 377 n. 5 (7th Cir.1992); United States v. Davis, 938 F.2d 744, 747 (7th Cir.1991).
 
 G. Gerald "Wee Wee" Crawford
 
 159
 1. Sufficiency of the Evidence--Conspiracy (Count One)
 
 
 160
 Crawford maintains that the evidence was insufficient to establish his membership in the conspiracy. The government points to the following evidence in response:
 
 
 161
 (1) Eastern testified to a number of transactions with Crawford involving either cash or cocaine. On one of these occasions, Sims delivered the cocaine directly to Crawford. See Tr. 143-44, 146-48, 149.
 
 
 162
 (2) Linda Williams, who was one of the Federal Express recipients of cocaine, testified that she typically gave the cocaine either to Frank Arms or "Wee Wee." Tr. 309-13. She had been introduced to "Wee Wee" by Jim McGee. Tr. 310.
 
 
 163
 (3) Rita Brown said she had once seen Crawford down the block from Williams' home. Tr. 360. More importantly, he and McGee had once come to Brown's house to count cash that Crawford brought with him. Tr. 358-59.
 
 
 164
 (4) Adrienne Ross had never met Crawford, but had heard Sims mention him in the context of conversations with "the people out in Milwaukee." Tr. 647.
 
 
 165
 (5) Beginning in October 1987 and continuing through January 1989, there were numerous calls between Los Angeles phones and beepers belonging to Sims, Tony Love, and Adrienne Ross on the one hand, and Milwaukee phones in the name of Crawford's girlfriend, Tracy Izard, on the other. Tr. 1027-1043.
 
 
 166
 We agree that the foregoing evidence, particularly the testimony of Eastern and Williams as to their first-hand dealings with Crawford, is sufficient to establish Crawford's membership in the conspiracy. Crawford was clearly involved with the workings of the conspiracy on more than an isolated or sporadic basis, and given his involvement with both the supply and income sides of the conspiracy, the jury acted well within reason when it concluded that Crawford had knowingly joined and aided the conspiracy. We therefore affirm Crawford's conviction on Count One of the third superseding indictment.
 
 
 167
 2. Sufficiency of the Evidence--Attempted Possession of Six Kilograms of Cocaine on July 7, 1988 (Count Two)
 
 
 168
 This charge is based on the failed attempt to make a controlled delivery of one of the intercepted Federal Express packages to Linda Williams. Williams, as we noted earlier, testified that she typically gave the cocaine that she received in this manner to Arms and/or Crawford. Tr. 309-13. The government contends that this fact, coupled with phone records suggesting that Crawford and the Sims people in Los Angeles were in contact during this time period (Tr. 1027-43) is enough to show that this shipment was destined for Crawford and that he may therefore be held liable for attempted possession.
 
 
 169
 We find it necessary to reverse Crawford's conviction on this count for the same reasons that we reversed Arms' conviction. The evidence simply does not support a reasonable inference that Crawford and Arms took a "substantial step" toward possession of this ill-fated shipment. Moreover, although the government elicited from Williams unequivocal testimony that Arms retrieved from her a portion of every cocaine shipment (Arms/Holloway Trial Tr. 326), it did not do the same with respect to Crawford (see id. at 324-28; Sims/Ochoa/Crawford Trial Tr. 309-12); thus, it is not clear that Crawford necessarily would have come into possession of this particular shipment had Sims not instructed Williams to refuse the packages. Accordingly, we reverse Crawford's conviction on Count Two of the third superseding indictment and remand for resentencing.
 
 
 170
 3. Admission of Crawford's 2 Encounters with Police in late 1988 and early 1990
 
 
 171
 The district court permitted the government to introduce evidence concerning the following two incidents involving Crawford:
 
 
 172
 (1) On November 26, 1988, a Milwaukee police officer stopped Crawford's car, and during the ensuing encounter, both Crawford and his passenger attempted to flee. Both were caught and found to be in possession of resale quantities of cocaine. Tr. 420-49. The government notes that on the following day, a phone call was placed from the residence of Milton and Corey Sims to the home of Crawford's girlfriend. Tr. 1043.
 
 
 173
 (2) On February 20, 1990, police stopped a car in which Crawford was a passenger. $2,775 in cash was scattered between the front and back seats. The circumstances suggest that Crawford was frantically trying to throw the money to another passenger in the back seat of the car. Crawford was also in possession of a loaded and cocked handgun. Tr. 460-64, 749-55.
 
 
 174
 The government contends that the first incident, which took place in the midst of Crawford's participation in the conspiracy, is substantial evidence of his participation. Although the government concedes that there is no evidence tying Crawford to the conspiracy on the date of the second incident, it points out that there is no evidence of his withdrawal and argues that this second encounter is evidence that he was, in fact, still "in the business." Gov.Br. 95.
 
 
 175
 The district court did not abuse its discretion in admitting evidence of either incident. Crawford's possession of cocaine in November of 1988 was consistent with his purported role in the conspiracy and was proper as substantial evidence of his participation in it. The relevance of the second incident may be less readily apparent, given the lack of evidence that Crawford was still involved in the conspiracy. However, the circumstances of that incident certainly suggest that Crawford remained active in the narcotics business, and in the absence of evidence that Crawford had withdrawn from the Sims conspiracy, it is reasonable to assume that Crawford was still involved in this particular distribution network. Accordingly, evidence of the incident in 1990 was properly admitted as substantive evidence of the charged conspiracy.
 
 H. Corey Sims
 
 176
 1. Failure to Give "Addict" and Vindictive Prosecution Instructions
 
 
 177
 Corey Sims contends that his trial counsel was ineffective in failing to request an "addict" jury instruction as well as a vindictive prosecution instruction. Both arguments may be disposed of in short order. Sims fails to identify any evidence in the record that would have supported such instructions, assuming that they would have been appropriate instructions in any event.
 
 2. Sentencing: Quantity of Drugs
 
 178
 Sims also makes a cursory argument that the district court at sentencing should have deemed him responsible for between one-half and one kilogram of cocaine rather than fifteen to fifty kilograms. However, he makes no effort whatsoever to point to evidence in the record which supports his position. Moreover, the premise underlying his contention is mistaken. As the government points out, the court adopted the very five to fifteen kilogram range Sims' counsel proposed. Sent.Tr. 9, 16. Certainly there is nothing in Sims' brief which suggests that it was plain error for the court to find him responsible for the very range that his own counsel urged on the court.
 
 III. CONCLUSION
 For the reasons set forth above, we:
 
 179
 (1) AFFIRM John Taylor's conviction on Counts One, Four, and Eight of the superseding indictment and REVERSE his conviction on Count Three and REMAND for resentencing;
 
 
 180
 (2) AFFIRM Milton Sims' conviction on Counts Three and Eight of the superseding indictment and REVERSE his conviction on Count Seven and REMAND for resentencing;
 
 
 181
 (3) AFFIRM Frank Arms' conviction on Count One of the second superseding indictment and REVERSE his conviction on Counts Three, Four, and Seven and REMAND for resentencing;
 
 
 182
 (4) AFFIRM Nathan Holloway's conviction on Counts One and Four of the second superseding indictment;
 
 
 183
 (5) REVERSE Roosevelt Williams' conviction on Counts Four and Six of the second superseding indictment and REMAND for resentencing;
 
 
 184
 (6) AFFIRM Saul Ochoa's conviction on Counts One, Two, Three, Four, and Five of the third superseding indictment and the imposition of a two-level sentencing enhancement for obstruction of justice;
 
 
 185
 (7) AFFIRMED Gerald Crawford's conviction on Count One and REVERSE his conviction on Count Two and REMAND for resentencing.
 
 
 186
 (8) AFFIRM Corey Sims' conviction and sentence.
 
 
 
 *
 The appeal of Roosevelt Williams, No. 91-2430, was submitted without argument
 
 
 [1]
 The appellants were prosecuted in four separate trials: Milton Sims and John Taylor were tried jointly in August 1990; Frank Arms and Nathan Holloway were tried in January 1991 along with Adrienne Ross and Stella Roberson (who have not appealed); Roosevelt Williams was tried singly in April 1991; and finally, Saul Ochoa, Gerald Crawford, and Corey Sims were tried together in July 1991. Because each of the appellant's convictions arises from the same charged conspiracy, we have set forth a single summary of the facts. However, unless otherwise indicated, any citations to the record in the analytical section of our opinion are of course to the record for the particular appellant whose claims we are addressing
 
 
 [2]
 As we have explained:
 "Our recent adoption of a distinct standard for reviewing sufficiency of the evidence claims in conspiracy cases does not imply, however, that the standard of review differs substantially from that employed when reviewing sufficiency claims in other types of cases. Rather, it merely reflects our concern that the prosecution's burden in conspiracy cases not be relaxed. [S]ubstantial evidence is merely evidence of sufficient quantity and quality to support the jury's verdict."
 United States v. Burrell, 963 F.2d 976, 987-88 (7th Cir.) (quoting United States v. Auerbach, 913 F.2d 407, 414 n. 6 (7th Cir.1990)), cert. denied, 113 S.Ct. 357 (1992).
 
 
 [3]
 Had the authorities not intercepted the packages in the first instance, they arguably would have remained in Sims' constructive possession at all times, in view of his control over the courier system. See United States v. Davis, 679 F.2d 845, 845, 852-53 (11th Cir.1982), cert. denied, 459 U.S. 1207, 103 S.Ct. 1198 (1983); United States v. Wilson, 657 F.2d 755, 762 (7th Cir.1981), cert. denied, 455 U.S. 951, 102 S.Ct. 1456 (1982). See generally United States v. Hernandez, 13 F.3d 248, 252 (7th Cir.1994); United States v. Boykins, 9 F.3d 1278, 1282-83 (7th Cir.1993)
 
 
 [4]
 Under a Pinkerton theory, the government might have been able to hold Arms to account for this shipment once Arms' participation in the conspiracy had been shown. But the district court did not permit the government to pursue that theory here and the jury was not given the requisite Pinkerton instruction as to this count or any of the other possession or attempted possession counts as to which we find the evidence insufficient to support a conviction